**Richard OLSEN, Petitioner–Appellant,**

v.

**Gerald T. McFAUL, Sheriff, Respondent–Appellee.**

**No. 86–4000.**

United States Court of Appeals, Sixth Circuit.

Argued and Submitted May 9, 1987.

Decided April 1, 1988.

Rehearing Denied May 13, 1988.

---

William T. Wuliger, Roger Kleinman, argued, Wuliger, Fadel & Beyer, Cleveland, Ohio, for petitioner-appellant.

John T. Corrigan, Domenic Delbalso, Richmond Heights, Ohio, for respondent-appellee.

Before KENNEDY, RYAN, and BOGGS, Circuit Judges.

RYAN, Circuit Judge.

Petitioner Olsen was convicted by an Ohio jury of writing a bad check and theft in office. He appeals the denial of a writ of habeas corpus under 28 U.S.C. § 2254, contending that both convictions are constitutionally invalid. We affirm the denial with respect to the bad check conviction, but reverse with respect to the theft in office charge.

## I.

Olsen was recreation director for the city of Broadview Heights, Ohio in 1980. At that time, he entered into negotiations with a representative of the World's Finest Chocolate Company (WFC) for the purchase of candy bars to be sold by participants in the summer recreation program as a fund-raising drive. The outcome of these negotiations was an order for 1,000 cases of candy bars, to be delivered on a consignment basis and sold, at a retail price of $30 per case. This initial order was for $30,000 worth of candy. The arrangement called for approximately one-half of the retail price of any candy sold to be retained by the fund-raising organization, and the remainder to be returned to WFC as payment for the candy. Any unsold candy could be returned to WFC for a full refund.

The city's charter provides that the city council

shall have the power ... [t]o authorize all contracts and make the necessary appropriations therefore. No contract shall be binding upon the City until it has been authorized or approved and the necessary money has been appropriated.

Art. III, § 7(e). The city department with immediate jurisdiction over fund-raising for city recreational activities is the Board of Recreation and Activities (the board). After placing his order with WFC, Olsen went to the board for approval of the agreement. The agreement was signed on December 2, 1980. On January 21, 1981, Olsen attended a board meeting where the candy fund-raising idea was considered. The board rejected Olsen's proposal on the grounds that independent fund-raising was not necessary because any shortfall in recreation funding would be made up by the city council. Therefore, no approval of the contract or appropriation of funds was ever sought from the council.

Consequently, on March 30, 1981, Olsen contacted the WFC salesman and sought to terminate the agreement, without ever specifically saying that the fund-raising scheme had not been approved by the city. The Salesman, unwilling to take no for an answer, talked Olsen into reducing the order from 1,000 to 350 cases instead of cancelling it entirely, by reminding Olsen that he already owed $600 for preprinted labels and suggesting that this would be a way of recouping what would otherwise be a $600 loss. The 350 cases of candy were delivered on May 1, 1981, to the city hall. About ten cases were damaged immediately when they were unloaded, and Olsen simply gave these cases away to bystanders.

At trial, the exact disposition of the remaining cases was never fully explained. Of the 350 cases, 235 were ultimately returned to WFC. Of the remaining 115 cases, Olsen claimed that about 75 cases were actually sold, although other figures were also mentioned at trial, from 54 to 70. Olsen had no clear idea of what happened to most of the remaining cases; some were lost, some were damaged, some were distributed for sale and never heard of again, and some were sold without Olsen ever obtaining or asking for the proceeds.

Similarly vague is how much money Olsen collected from the sales and what became of it. Some money financed a trip for one girls' softball team; some of it was allegedly spent to build a new backstop for the ballfield. However, there were other

fund-raising activities during the summer of 1981, increasing the amount of money Olsen handled, and introducing further unresolved confusion as to how much of the money may possibly have ended up in Olsen's pockets.

What is perfectly clear is that WFC pursued Olsen all summer, calling him at home and at city hall and leaving numerous messages. Olsen never returned the calls, nor did he pay the bill.

Olsen was replaced as recreation director in December 1981, and the new director promptly contacted Olsen to inquire about bills submitted to the city by WFC which the city finance department knew nothing about. Olsen responded that the debt was "taken care of." The next month the new director received another bill, and contacted Olsen again, at which time Olsen suggested that the check must have been lost in the mail. In fact, no check had been sent.

The matter was then turned over to the city's law department, which made a determination—and this is critical to our resolution of this case—that the city was obligated to pay the bill, but that Olsen was obligated to reimburse the city. The law director called Olsen into the mayor's office for a meeting in late January 1982. Olsen failed to appear at this first scheduled meeting, but did appear at a second scheduled meeting on February 6. He was asked to pay the bill. He responded that he needed to make a phone call in order to arrange payment, and was allowed to use the phone. He called the weather. No check was forthcoming in the succeeding days.

On March 18, 1982, the city sent two policemen to Olsen's home. According to Olsen, one of them said, "If you don't come with me, I'm going to break both your arms." Olsen cooperated, driving himself to city hall. While the same policeman who issued the threat remained in the room, Olsen then met with the law director, who informed him that he would be charged that night with five felonies if he did not write out a check for the full amount owed WFC. Olsen claimed he did not have that much money in his checking account, but ultimately the law director accepted a check, dated the following day, for $1,852.43. The check was returned unpaid twice. Eventually, the city paid the bill itself.

## II.

On November 5, 1982, Olsen was indicted in state court for three offenses: grand theft, theft in office, and issuing a bad check. The grand theft charge stated the date of the offense as December 1, 1981, and charged that Olsen,

knowingly and by deception obtained or exerted control over money with the purpose to deprive the owner, City of Broadview Heights, of said property or services. The value of said property or services being $150.00 or more....

The theft in office charge alleged the same date for the offense, December 1, 1981, and charged that Olsen,

purposely, being a public official, did commit a theft offense, the said Richard W. Olsen having used his office or permitted or assented to its use in aid of committing the offense, the property or services involved owned by the municipality of Broadview Heights in violation of Section 2921.41 of the Ohio Revised Code.

The bad check charge gave March 19, 1982, as the date of the offense, included a copy of the bad check, and charged that Olsen,

with the purpose to defraud City of Broadview Heights, issued or transferred or caused to be issued or transferred a negotiable instrument, to-wit: a check, knowing that it would be dishonored.

Olsen sought a bill of particulars, and, in late December of 1982, received the following explanation of the charges against him:

That on or about *March 26, 1982*, at approximately during business hours, at the location of 9243 Broadview Road, in the city of Broadview Heights, Ohio, the Defendant, RICHARD OLSEN unlawfully and purposely and with the purpose to defraud City of Broadview Heights, issued or transferred or caused to be is-

sued or transferre[d] a negotiable instrument, to-wit: a check, knowing that it would be dishonored.

FURTHERMORE, *on the same date,* at the same time, and at the same location, the Defendant, RICHARD OLSEN unlawfully and purposely being a public official, did commit a theft offense, the said RICHARD W. OLSEN having used his office or permitted or assented to its use in aid of committing the offense, the property or services being involved owned by the municipality of Broadview Heights in violation of Section 2921.41 of the Ohio Revised Code.

FURTHERMORE, *on the same date,* at the same time, and at the same location, the Defendant, RICHARD OLSEN unlawfully and knowingly and by deception obtained or exerted control over money with the purpose to deprive the owner, City of Broadview Heights, of said property or services.

(Emphasis added). Thus, the bill of particulars changed the date of the bad check offense from March 19 to March 26, 1982, and changed the date of the other two offenses from December 1, 1981, to March 26, 1982, the same day the bad check offense was said to have occurred.

Nothing appears in the record to explain why the dates December 1, 1981, and March 26, 1982, were used on the indictment and the bill of particulars. The bad check offense was originally pegged to the date, March 19, 1982, the date written on the check by Olsen on the evening of March 18. The bill of particulars changed this date to March 26 for no apparent reason. The theft in office offense was also changed to March 26, also for no apparent reason, after initially being fixed upon another date of no apparent significance, December 1, 1981. The initial agreement between Olsen and WFC was entered into on December 2, 1980. A defense attorney confronted with these dates might well have wondered whether the state had evidence of events other than those that his client had revealed to him. The prosecution, however, never explained the significance of these dates.

Olsen sought a further bill of particulars, but never obtained it. At trial, the court ruled that the amount stolen was not $30,000, the amount of the original order, but $1,852.43, the amount of Olsen's bad check, an amount ultimately paid by the city to WFC. Olsen's counsel continued to complain, however, that the prosecutor should be required "to define precisely what he's claiming—he is coming at me scattershot." He went on:

I don't know what is the nature of the claim as to what has been stolen, and from who [*sic*] it's been stolen and to date he's never indicated in his opening statement, and I can't tell—I'm getting confused, and I'm sure the jury will.

After the prosecution's case had been presented, the prosecution sought to amend the dates in the indictment to read that "the theft offenses occurred during the time period December 2, 1980 through March 19, 1982." Again, defense counsel objected strenuously, stating:

I want to know what was charged so that I could prepare. I've talked about it on numerous occasions here, and now they're amending the indictment, or seeking to amend it to cover a lot of time and a lot of place and losing specificity, and if there was a theft, what was it, and when did it take place?

The amendment was allowed.

The defendant testified extensively in his own behalf, and was cross-examined at length. The prosecutor maintained a steady habit of making sarcastic comments about Olsen's answers. The following interchange is typical both for its style and its substance. The prosecutor asked:

*Q.* You owed [the city] some money, didn't you?

*A.* No, sir.

*Q.* You—

*A.* I owed them nothing.

*Q.* You owed the candy company money?

*A.* I never denied that.

*Q.* You never paid anyone, have you?

*A.* I might have paid one or two bills at one time or another.

*Q.* That's big of you. So assuming that this letter was sent to you—

[*Defense counsel*]: May we approach the bench?

The only sign in the record that the prosecutor was admonished before the jury was early in the trial, when the prosecutor cut off the defense counsel by saying, "Shut up, clown." To this the court responded:

Now, listen, gentlemen, I'm a patient man, but I'm just going to go so far and somebody is going to get cited for contempt, and when I cite you, believe me, you are going to pay for it.

Defense counsel sought an instruction on duress with respect to the bad check charge, and the court declined to give the instruction. The court gave the following instruction on knowledge:

Knowledge. Knowledge of the defendant that the check would be dishonored or its payment refused is an essential element of the charge. You may presume the defendant knew that the check would be dishonored if, after you [have] considered all of the evidence, you find beyond a reasonable doubt that the check was properly refused payment for insufficient funds upon presentation within 30 days after the issue or the date set forth on the check, whichever was later, and the obligation was not paid or satisified within ten days after notice [was] served on the defendant.

As for the theft offenses, the court gave a standard instruction on the meaning of "Owner" and described the "principal difference" between the state's theory of the case and the defendant's theory of the case:

[T]he State's evidence is that the defendant in his dealing with the World's Finest Chocolate Company, was acting as representative of the City of Broadview Heights.

In the deal with the World's Finest Chocolate, the defendant pledged the credit of the City of Broadviev Heights, and thus legally bound the city and would also raise other legal problems.

In substance and in summary, the defendant's evidence differs from the State's evidence in that the defendant offered evidence to the effect that in his dealings with the World's Finest Chocolate Company, he did not use his position as director of recreation for the City of Broadview Heights, but pledged his personal credit only.

The jury convicted Olsen of all three offenses. He was given a suspended sentence of three concurrent half-year terms and required to make full restitution, which he has done. On appeal, the Ohio Court of Appeals vacated the conviction for grand theft and affirmed the other two convictions. The Ohio Supreme Court denied leave to appeal and a motion for rehearing. A petition for writ of habeas corpus was denied by the district court, which adopted a magistrate's recommendation.

### III.

The linchpin of this habeas petition is Olsen's contention that the prosecution's successful theory of the case, which was never plainly revealed before or during trial, is in fact contrary to the well-established law of the state of Ohio. The prosecution's theory, as the trial judge explained in his jury charge, was that Olsen acted as a "representative" of the city in his dealings with WFC, "pledged the credit" of the city in his contract with WFC, "and thus legally bound" the city to make good on the obligations into which he entered.

Both sides agree that Olsen had no actual authority to contract for the city. The city charter states unambiguously that the City Council

shall have the power ... [to] authorize all contracts and make the necessary appropriations therefor. No contract shall be binding upon the City until it has been authorized or approved and the necessary money has been appropriated.

The WFC agreement was presented to the recreation board, rejected, and never presented to the city council for approval.

The question is whether, despite Olsen's lack of actual authority, he had implied or apparent authority sufficient to bind the city to the WFC agreement. The concept

of apparent authority, as recognized in Ohio, has been described as follows:

> Even where one assuming to act as agent for a party in the making of a contract has no actual authority to so act, such party will be bound by the contract if such party has by his words or conduct, reasonably interpreted, caused the other party to the contract to believe that the one assuming to act as agent had the necessary authority to make the contract.

*Cascioli v. Central Mut. Ins. Co.*, 4 Ohio St.3d 179, 181, 448 N.E.2d 126 (1983) (quoting *Miller v. Wick Bldg. Co.*, 154 Ohio St. 93, 93 N.E.2d 467 (1950)).

The Ohio Court of Appeals, in an unpublished opinion, reviewed the evidence presented by the prosecution, particularly the testimony of David Rehm, the WFC representative, and other witnesses, and rejected Olsen's claim that he did not have apparent authority to bind the city:

> According to Rehm, appellant indicated to him that he was acting in the capacity of Recreation Director of the City of Broadview Heights when he signed the consignment agreement. It was reasonable for Rehm to think the City was liable on the contract. The meeting was held in City Council chambers. The billing was to be made to the City. The candy was delivered to the City and unloaded by City service personnel. The labels had the name of Broadview Heights Recreation on them. The candy was stored at the City Recreation Hall. Sufficient evidence existed that appellant had apparent authority. There are no statutory restrictions which would negate his apparent authority.

Olsen contends that these facts do not show that the city, as principal, gave Olsen the appearance of authority; rather, they show that Olsen unilaterally acted in such a way that Rehm assumed that authority existed. It is arguable whether the evidence was sufficient to prove apparent authority. It is not arguable that the evidence was sufficient, when "considered in the light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. 307,

319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), to foreclose habeas relief on the grounds that *facts* tending to show apparent authority had not been proven.

It appears also to be unarguable, however, that, under Ohio *law*, the doctrine of apparent authority cannot be used to bind a city to a contract.

State departments and agencies only have the limited power to contract which is delegated to them by the state legislature. See Section 20, Article I, Ohio Constitution; *Cincinnati, Wilmington & Zanesville RR. Co. v. Commrs. of Clinton Cty.* (1852), 1 Ohio St. 77, 85–86; *Allied Delivery System Co. v. Hamilton* (Apr. 1, 1982), Franklin App. No. 81AP–727, unreported; Vaubel, Relief Under a Defective Municipal Contract in Ohio (1968), 2 Akron L.Rev. 20, 30. The following holding of the Ohio Supreme Court is as valid today as it was in 1918:

> "Where a statute prescribes the mode of exercise of the power therein conferred upon a municipal body, the mode specified is likewise the measure of the power granted, and a contract made in disregard of the express requirements of such statute is not binding or obligatory upon the municipality." *Frisbie Co. v. City of East Cleveland* (1918), 98 Ohio St. 266 [120 N.E. 309], paragraph one of the syllabus. See, also, *Ludwig Hommel & Co. v. Village of Woodsfield* (1927), 115 Ohio St. 675 [155 N.E. 386], paragraph two of the syllabus; *Lancaster v. Miller* (1898), 58 Ohio St. 558 [51 N.E. 52], paragraph one of the syllabus; *McCloud & Geigle v. Columbus* (1896), 54 Ohio St. 439 [44 N.E. 95].

*Accutemp, Inc. v. Longview State Hosp.* 10 Ohio App.3d 223, 226–27, 461 N.E.2d 905 (1983) (Moyer, J., dissenting) (discussing an issue not reached in the court's opinion). The policy behind this rule has been described as follows:

> We think there is no hardship in requiring them, and all other parties who undertake to deal with a municipal body in respect of public improvements, to investigate the subject and ascertain at their peril whether the preliminary steps leading up to [the] contract and pre-

scribed by statute have been taken. No high degree of vigilance is required of persons thus situated to learn the facts. They are dealing with public agencies whose powers are defined by law, and whose acts are public transactions, and they should be charged with knowledge of both. If the preliminary steps necessary to legalize a contract, have not been taken, they can withdraw from the transaction altogether, or delay until the steps are taken....

An occasional hardship may accrue to one who negligently fails to ascertain the authority vested in public agencies with whom he deals. In such instances, the loss should be ascribed to its true cause, the want of vigilance on the part of the sufferer, and statutes designed to protect the public should not be annulled for his benefit.

*CADO Business Systems v. Board of Educ.,* 8 Ohio App.3d 385, 388, 457 N.E.2d 939 (1983) (citations omitted) (quoting *McCloud & Geigle v. Columbus,* 54 Ohio St. 439, 452–53 (1896)). This principle has been reaffirmed by the Ohio Supreme Court in *Lathrop Co. v. City of Toledo,* 5 Ohio St.2d 165, 214 N.E.2d 408 (1966), and discussed by this court in *Hubbel, Roth & Clark, Inc. v. City of Gallipolis,* 660 F.2d 201, 207 n. 1 (6th Cir.1981). *See also* 1985 Op.Ohio Att'y Gen. 43, 1978 Op.Ohio Att'y Gen. 24.

The term "apparent authority" was never mentioned in the trial court, although it was implicitly the theory relied upon by the prosecution to establish that Olsen legally bound the city to the WFC agreement. The term was mentioned, and the concept addressed, for the first time in Olsen's appeal to the Ohio Court of Appeals. There, the court cited none of the cases we have just cited, but decided simply that the facts could establish apparent authority and that compliance with the city charter was not called for here, because the WFC agreement was a consignment contract. As such, the agreement did not call for any appropriation by the city, and did not need prior approval to be valid. This reasoning ignores the clear language of the city charter, which requires both prior appropriation

of "the necessary money" and prior authorization of all contracts. Without this, "no contract shall be binding upon the City."

We are thus compelled to conclude that Olsen has been prosecuted and convicted for the theft of property that did not belong to the supposed victim, the city. The city represented to Olsen, to the court, and to the jury that it was legally obligated on the WFC contract, and that Olsen's failure to account for all of the candy proceeds and reimburse the city for the full amount owed to WFC amounted to the conversion of public funds by a city official for his personal use. It appears, however, that the city's law department was in error when it concluded that the city was bound by the agreement with WFC and that, if the city had cited its city charter and referred WFC to pertinent legal authority, such as *Lathrop Co. v. City of Toledo,* 5 Ohio St.2d 165, 214 N.E.2d 408 (1966), or *Frisbie Co. v. City of East Cleveland,* 98 Ohio St. 266, 120 N.E. 309 (1918), WFC would have had no recourse but to pursue Olsen, through legal action if necessary, to recover from him the debt he concededly owed. Had the city not misrepresented the law applicable to cities, Olsen would never have been accused, much less indicted and tried, for the crimes of which he stands convicted.

Furthermore, under Ohio law, WFC had a duty to make sure any contract it entered into with a municipal agent comported with legal requirements, and when this duty was neglected, the law required that the private contractor, not the city, must absorb any loss. Thus, it is not merely the theory of apparent authority that cannot serve to obligate a city when statutory approval of a contract has been neglected. Rather, *any* theory is invalid that would authorize the commitment of unappropriated municipal funds to a contractor who has relied carelessly upon appearances to conclude that a municipal official has actual authority to contract on behalf of the city.

In *Frisbie Co. v. City of East Cleveland,* 98 Ohio St. 266, 120 N.E. 309 (1918), a contractor, who had expended great sums installing water mains in streets subse-

quently dedicated to public use by the city, was denied recovery both on the contract, because statutory competitive bidding had been neglected, and under the theory that the city owed, as damages, the sum expended by the contractor on improvements converted to the city's use. The court rejected the latter theory for the reason that:

> It would be difficult to perceive ... how any special benefit would be afforded the public by either constitutional or legislative limitations and restrictions upon the power of inferior public bodies and boards to contract, if, notwithstanding the violation of such provisions, there can still be a recovery from the municipality.

*Id.* at 278, 120 N.E. 309. Similarly, in *Lathrop Co. v. City of Toledo,* 5 Ohio St.2d 165, 168, 214 N.E.2d 408 (1966), the Ohio Court of Appeals' denial of recovery to a contractor in part because "an action for *quantum meruit* does not lie against the City," was reversed by the Ohio Supreme Court only because it concluded that the city charter requirements had been complied with. Even if it could be shown that the city here accepted benefits from the WFC contract, perhaps because candy receipts paid for a softball backstop, this would not alter the fact that WFC had no right of recovery against the city under Ohio law.

Having said all of that, the relevance of which will be addressed shortly, we continue to be mindful that our duty is limited to determining whether Olsen's convictions were obtained in violation of federal constitutional guarantees.

## IV.

### A.

 In pursuance of that duty, we first address Olsen's claim that his conviction for writing a bad check was obtained in violation of the due process clause of the fourteenth amendment. The crime is described as follows:

> No person, with purpose to defraud, shall issue or transfer or cause to be issued or transferred a check or other negotiable instrument, knowing that it will be dishonored.

Ohio Rev.Code Ann. § 2913.11(A) (1987). Olsen's central contention is that, because, under a correct reading of the civil law of Ohio, he owed no debt to the city, he could not have had the requisite fraudulent intent when he wrote the check, even if he did so knowing it would be dishonored.

We reject this contention. Although Olsen has recently discovered a legal theory that supports his consistent assertion that he owed nothing to the city, there is no evidence tending to suggest that he had this or any other firm basis for his refusal to acknowledge any obligation to the city *at the time he wrote the check.* His sole rationale at trial was a subjective impression that he had incurred a personal debt and did not intend to obligate the city on the contract. The jury disbelieved Olsen on this point, and found that he in fact wrote the check in order to avoid paying a debt he thought lawful at the time. There was evidence from which the jury could have found that the city paid for the candy relying, at least in part, on the bad check and that Olsen knew or should have known that the city intended to use the proceeds of the check to pay for the candy. The city attorney testified that he recommended that Olsen would honor the check. The subsequent discovery of a legal defense to that debt cannot alter his state of mind at that time, and the conflicting evidence presented on this point at trial provides this court with no justification for discarding the conclusions of the jury. *See Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

There was more than enough evidence from which the jury could conclude that Olsen wrote the check "with purpose to defraud." While the city should not have demanded payment from Olsen, writing a bad check was not a legitimate way of contesting a debt. There was, therefore, neither error nor injustice in Olsen's conviction for that offense, despite the absence of a legitimate underlying debt.

### B.

■ Olsen also contends that the jury's conclusion that he wrote the check "knowing that it will be dishonored" was constitutionally flawed because the court's instructions effectively created an illegitimate conclusive presumption on this element of the crime. *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). The presumption of knowledge contained in the judge's instruction was taken almost verbatim from the statute that defines this crime:

> For purposes of this section, a person who issues or transfers a check or negotiable instrument is presumed to know that it will be dishonored, if ... the following occurs:
>
> \* \* \* \* \* \*
>
> (2) The check or instrument was properly refused payment for insufficient funds upon presentment within thirty days after issue or the stated date, whichever is later, and the liability of the drawer, indorser, or any party who may be liable thereon is not discharged by payment or satisfaction within ten days after receiving notice of dishonor.

Ohio Rev.Code Ann. § 2913.11(B) (1987).

The presumption contained in this statute is clearly a mandatory one. While the court, in instructing the jury, used the permissive "may" rather than the statutory "is presumed," there was nothing else in the instructions, as there was in *Ulster County Court v. Allen,* 442 U.S. 140, 161, 99 S.Ct. 2213, 2226, 60 L.Ed.2d 777 (1979), tending to inform the jury that this is a "permissive inference available only in certain circumstances." However, in *Ulster County,* the Supreme Court declined to review the constitutionality of a statutory presumption "on its face" when the defendants in that case could not show any adverse impact upon their own rights. *Id.* at 155, 99 S.Ct. at 2223. For the same reason, Olsen's similar contention must fail.

Ohio's statutory presumption with respect to knowledge that a check will be dishonored substitutes certain specified facts, capable of easy proof by the state, for one element of the crime. However,

the facts in the record which give rise to an inference that Olsen knew the check would be dishonored are in fact quite probative on the point. The evidence was that he told the law director that sufficient funds were not in the account but that he would quickly effect a transfer to cover the check. Concededly, he never did so, and his rationale was simply that he felt all along that he owed nothing to the city. It is hard to read this evidence any other way than to suggest that Olsen never doubted but that the check would be dishonored. Moreover, Olsen brought no evidence tending to suggest that he did *not* know the check would be dishonored. He never contended, for example, that he suddenly discovered, after writing the check, that he did not have funds to cover it, or that he suddenly decided, after writing the check, that he would not place funds in the account to cover it. Consequently, Olsen could not have been prejudiced by the recourse to the statutory presumption, and the contention that the statute was unconstitutional in its application to him is therefore meritless.

### C.

■ Finally, Olsen contends that his conviction on the bad check charge was unconstitutional because he requested, and was denied, an instruction on duress. The Ohio Court of Appeals reasoned that there was no reason to instruct on duress, because the policeman's threat to break Olsen's arms, assuming it was made, was made only to force Olsen to go to city hall. It could not have caused him to write out a check after he arrived at city hall and met with the city's law director. Olsen replies that the policeman was still present when he wrote the check, and that he (Olsen) was still intimidated.

Olsen's argument proves only that, if it had been made in the trial court, and it was not, it might have sufficed to convince the trial court to give the requested instruction. Though duress could be a complete defense to a bad check charge, Olsen's argument on this point is premised upon nothing more than a claim of simple in-

structural error on the part of the trial court. Even if we were to agree that the instruction should have been given, this error falls far short of a showing that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

We discern no constitutional error in Olsen's bad check conviction.

## V.

Olsen's conviction for the theft in office offense is more troubling. The offense is described as follows:

> No public official or party official shall commit any theft offense, as defined in division (K) of section 2913.01 of the Revised Code, when either of the following applies:
>
> (1) The offender uses his office in aid of committing the offense, or permits or assents to its use in aid of committing the offense;
>
> (2) The property or service involved is owned by this or any other state or the United States, a county, municipal corporation, or township, or any political subdivision, department, or agency of any of them, or is owned by a political party, or is part of a political campaign fund.

Ohio Rev.Code Ann. § 2921.41(A) (1987). One element of the offense, therefore, was that the property stolen was the property of the city, and this requirement exists apart from the element of *mens rea* essential to establishing the predicate theft offense. In other words, if Olsen had shown at trial that the city did not own the property in question—that it did not owe any money to WFC—that would have been a complete defense to the theft charge, regardless of whether Olsen actually knew at the time that he was personally obligated to WFC and that the city was not obligated to WFC.

The evidence at trial was unambiguous on this point. In fact, the state's case against Olsen was premised entirely upon an implicit theory of apparent authority. While the expression "apparent authority" was never mentioned at trial, the prosecution's theory was that Olsen "pledged the credit" of the city by causing the WFC representative to think that Olsen was contracting on the city's behalf, even though, concededly, the legal steps that would have invested Olsen with actual authority were never taken. The Ohio Court of Appeals affirmed the conviction expressly on the ground that: "Sufficient evidence existed that appellant had apparent authority." If the civil law of Ohio is clear that Olsen could not have had apparent authority, and could not have obligated the city to WFC except by receiving city council authorization, then the evidence presented at trial proved, beyond question, that Olsen could not have committed the offense charged.

Furthermore, as we have stated above, we are convinced that the Ohio Supreme Court's decision in *Frisbie Co. v. City of East Cleveland,* 98 Ohio St. 266, 120 N.E. 309 (1918), which continues to be followed and cited with approval, is the law in Ohio, and we see no indication that it has received a narrowing construction in recent years. If a civil appeal based upon diversity jurisdiction turned upon the question of whether a city may be obligated to a contractor absent compliance with city charter requirements, we would have little trouble ascertaining the applicable Ohio rule.

> A federal court sitting in diversity must apply the law of the state's highest court. If the highest court has not spoken, the federal court must ascertain from all available data what the state law is and apply it. If the state appellate court announces a principle and relies upon it, that is a datum not to be disregarded by the federal court *unless it is convinced by other persuasive data* that the highest court of the state would decide otherwise. *See West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 236–37, 61 S.Ct. 179, 183, 85 L.Ed. 139 (1940); *Ruth v. Bituminous Casualty Corp.,* 427 F.2d 290, 292 (6th Cir. 1970).

*Clutter v. Johns–Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir.1981) (emphasis added).

The fact that a panel of the Ohio Court of Appeals has, in this case, filed an unpublished opinion apparently ignoring the long-established *Frisbie* rule is a datum to consider, but not a very weighty one in this instance. While ordinarily, "where the highest court of the State has not spoken, this Court is obligated to follow published intermediate state appellate court decisions," *Ruth v. Bituminous Casualty Corp.*, 427 F.2d 290, 292 (6th Cir.1970), "[w]e are not bound by a decision of an intermediate state appellate court when we are convinced that the highest state court would decide differently." *Dale Baker Oldsmobile, Inc. v. Fiat Motors of North America, Inc.*, 794 F.2d 213, 218 (6th Cir. 1986). Here, the highest court of the state *has* spoken. Moreover, the intermediate court opinion was unpublished and, far from distinguishing *Frisbie* and related authority, gave no indication that the court had been made aware of any case law in conflict with its view on the applicability of "apparent authority" to municipalities. The intermediate appellate court's decision in this criminal appeal has not altered the civil law of Ohio.

It thus appears manifest that an injustice has been done in this case, by the failure to apply a rule of civil law that, if applied, would have established that the property Olsen was charged with stealing never belonged to the supposed victim of the theft. It remains to be seen, however, whether Olsen's conviction resulted from error of constitutional dimension, such that this court should grant his petition for the writ of habeas corpus.

[T]he violation of a state statute or rule of practice does not, by itself, constitute deprivation of a right guaranteed by the Constitution of the United States. Misapplication of State law, absent invidious discrimination, does not necessarily present a federal constitutional question. *Beck v. Washington*, 369 U.S. 541, 554–55, 82 S.Ct. 955 [962–63], 8 L.Ed.2d 98 (1962); *Snowden v. Hughes*, 321 U.S. 1, 11, 64 S.Ct. 397 [402], 88 L.Ed. 497 (1944); *Gemmel v. Buchkoe*, 358 F.2d 338 (6th Cir.1966), *cert. denied*, 385 U.S. 962, 87 S.Ct. 402, 17 L.Ed.2d 306 (1966);

*Worth v. Michigan*, 291 F.2d 621 (6th Cir.1961), *cert. denied*, 368 U.S. 862, 82 S.Ct. 105, 7 L.Ed.2d 59 (1961); *Hicks v. Michigan*, 281 F.2d 645 (6th Cir.1960).

*Combs v. Tennessee*, 530 F.2d 695, 698 (6th Cir.), *cert. denied*, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976). The Supreme Court has cautioned that:

[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a "failure to observe that fundamental fairness essential to the very concept of justice." *Lisenba v. California*, 314 US 219 [62 S.Ct. 280, 86 L.Ed. 166 (1941)].

*Donnelly v. De Christoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). Our first inquiry must be into whether "the State has denied [Olsen] the benefit of a specific provision of the Bill of Rights." *Id.* at 643, 94 S.Ct. at 1871.

We have discovered no cases that could serve as direct precedent here. The unique facts of Olsen's case assure that it will be in some manner distinguishable from those cases cited in appellant's briefs. Nonetheless, there is merit to several of the arguments Olsen makes.

### A.

Olsen faults the prosecutor both for a pattern of improper remarks at trial and for a persistent refusal to clarify the nature of the theft charges so as to permit Olsen to prepare an adequate defense. As for the prosecutor's remarks,

Our Court has identified the factors we are to consider in weighing the extent of prosecutorial misconduct in habeas cases.

"In every case, we consider the degree to which the remarks complained of have a tendency to mislead the jury and to prejudice the accused; whether they are isolated or extensive; whether they were deliberately or accidentally placed before the jury, and the strength of the competent proof to establish the guilt of the accused."

*United States v. Leon*, 534 F.2d 667, 679 (6th Cir.1976). However, even when re-

viewing prosecutorial misconduct on direct appeal, this Court has remarked:

"More commonly, however, the complained-of conduct will not rise to *reversible error*, notably if it is not flagrant, where proof of guilt is overwhelming, where counsel does not object and/or where the trial judge steps in and admonishes the jury [citations omitted]. Indeed, it is notable how often courts cite improper argument by a prosecutor and how seldom they reverse convictions because of it."

*United States v. Bess*, 593 F.2d 749, 757 (6th Cir.1979) (emphasis in original).

*Webster v. Rees*, 729 F.2d 1078, 1080 (6th Cir.1984). The prosecutor's remarks here appear to have been quite deliberate; he persisted in characterizing the WFC salesman as "old and feeble" to mock Olsen, who had used that expression, even after the court has specifically sustained an objection to this form of cross-examination. In addition to the conduct previously described, the prosecutor belittled Olsen, referring to him as a "deadbeat," "thief," "creep," and "liar." Olsen's counsel objected repeatedly and to little avail. However, the court never directly admonished the jury to disregard the remarks to which objections were sustained. It is also true that proof of guilt was not overwhelming.

Considered in the context of the whole trial, however, the prosecutor's gratuitous insults did not deprive Olsen of a fair trial. While not isolated, neither were they pervasive, and they may even have tended to create sympathy, rather than scorn, for their victim.

### B.

■ Olsen's contention that the theft in office indictment was insufficient to apprise him of the crime with which he was charged is more compelling.

No principle of procedural due process is more clearly established than that notice of the specific charge, and a chance to be heard in a trial of the issues raised by that charge, if desired, are among the constitutional rights of every accused in a criminal proceeding in all courts, state and federal.

*Cole v. Arkansas*, 333 U.S. 196, 201, 68 S.Ct. 514, 517, 92 L.Ed. 644 (1948). In *Cole*, the Supreme Court reversed convictions which had been affirmed on the strength of a different section of a state statute than had been used to convict. *Cole* was applied in the habeas corpus context in *Watson v. Jago*, 558 F.2d 330 (6th Cir.1977), to grant the petition of a defendant who was convicted after his indictment was amended at trial to include an offense not contained in the indictment.

The due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense. See, *e.g., In Re Ruffalo*, 390 U.S. 544, 88 S.Ct. 1222, 20 L.Ed.2d 117 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir.1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir.1977). This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial. *Combs v. Tennessee*, 530 F.2d at 698.

*Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir.1984). In *Koontz*, this court affirmed the grant of a writ of habeas corpus when an indictment was amended several days before trial to charge a violation of a different section of the Ohio arson statute than the one originally cited.

The original indictment charged petitioner with the violation of § 2909.02(A)(2) while the amended indictment charged him with a violation of § 2909.02(A)(3). Because the amended indictment charged a conspiracy rather than a single party action, petitioner was unduly prejudiced by the change. Although the original indictment informed the petitioner of the event complained of—the burning down of the hotel—he

was not sufficiently informed of the specific crime with which he was charged. *Koontz,* 731 F.2d at 370.

Olsen's case is distinguishable from *Koontz, Watson,* and *Cole* in that, in his case, the confusion was not about which statutory crimes he was charged with committing, but about what acts the state thought sufficient to prove them. Despite this distinction, however, this case is similar to those cases in that the faulty indictment contributed to the inadequacy of Olsen's trial preparation.

Manifestly, Olsen's counsel never did understand the theft charges with enough "precision and certainty" to prepare a meaningful defense. His confusion was obvious, and he stressed it repeatedly to the court, objecting that he could not craft a defense to an indictment so vague and uninformative. The only information provided with respect to the theft, aside from the name of the municipality concerned, was the date of the alleged offense. However, the key dates in the indictment were changed twice, and finally left so indeterminate as to furnish no assistance whatsoever in determining what city property Olsen was charged with stealing and how the theft was thought to have been carried out.

Had the indictment provided fair notice of the charges, Olsen's counsel, who otherwise performed quite creditably, would have had the opportunity to anticipate how each element of the offense would most likely be addressed in the state's proofs and to research the point of municipal liability on unauthorized contracts which was obviously the keystone of the state's case. He might then have discovered the crucial flaw in the state's legal theory. Instead, he had time only to object repeatedly and to contest the case on the assumption that the state's view of the law was correct.

### C.

█ Olsen also faults the Ohio courts for failing to apply, in his case, the pertinent civil law of that state. The trial court, he complains, failed to instruct the jury upon the law of "apparent authority" that was vital to the state's case, and without which

a key element of the crime of theft in office could not be proven. The court of appeals, he contends, deprived him of the due process of law by upholding his conviction under a novel theory that was not expressly relied upon at trial and that demonstrably was not the law of Ohio at the time Olsen committed the acts for which he was convicted.

Again, it must be said that the cases Olsen cites do not provide direct authority for granting him the relief he seeks. In *Bouie v. Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), the Supreme Court held that, when a state appellate court affirms a conviction by construing a statute in a new and unexpected manner, thereby making criminal what previously was not recognized as such, the conviction violates the due process clause and must be reversed. Olsen's case is unlike *Bouie* in that, as we have previously suggested, the Ohio Court of Appeals probably cannot be said to have changed the law of Ohio and to have applied the change retroactively in Olsen's case. Rather, the Ohio Court of Appeals simply failed to refer to a rule of law that still remains in effect and that would have altered the outcome in Olsen's case.

This distinction, however, actually makes the unfairness here more egregious than that in *Bouie.* In *Bouie,* it was possible to argue that the statute alone, regardless of the unprecedented judicial gloss placed upon it by the state appellate court, gave sufficient notice of what was prohibited. *See Bouie,* 378 U.S. at 363, 84 S.Ct. at 1708 (Black, J., dissenting). Here, on the other hand, Olsen's conduct did not constitute theft in office when carried out, and would not constitute theft in office if committed today, so his conviction under that statute is not even arguably just or correct.

> When a[n] ... unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime.

*Bouie,* 378 U.S. at 354–55, 84 S.Ct. at 1702–03.

Olsen's contention that the trial court should have given an instruction on "apparent authority" similarly identifies a serious flaw in his trial, even though the argument, as stated, seems problematic. For one thing, instructing on apparent authority would have been as erroneous as *not* instructing on apparent authority, because the real problem was the implicit assumption by the court that this concept may be applied to bind municipalities on unauthorized contracts. Olsen's complaint is not that the court failed to instruct, but, more fundamentally, that the court did not know the law and consequently gave instructions that were seriously incomplete, effectively incorrect, and extremely disadvantageous to the defendant.

Furthermore, Olsen's counsel never sought an instruction on apparent authority, so Olsen faces an initial burden of showing "cause and prejudice" for his procedural default, *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), and an added heavy burden of showing that the failure to instruct amounted to constitutional error. *Henderson v. Kibbe,* 431 U.S. 145, 154–55, 97 S.Ct. 1730, 1736–37, 52 L.Ed.2d 203 (1977).

Olsen contends that the cause for his procedural default at trial, the failure to request an apparent authority instruction, was that his counsel's assistance was constitutionally ineffective. However, even if we could be persuaded that a defense attorney's assistance was constitutionally deficient because he failed to discover a relatively arcane rule of municipal law in preparation for a criminal trial in which the relevance of that rule was obscured by a vague indictment and never hinted at by the court or the prosecution, we could not accept Olsen's argument, because the Supreme Court has held, in *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2646, 91 L.Ed.2d 397, 409 (1986), that "a claim of ineffective assistance must be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." Olsen has not presented this claim to the Ohio courts; it is therefore unexhausted and cannot be decided by this court as an initial matter.

*Murray v. Carrier* also held that *"both* cause and prejudice must be shown," *id.,* 477 U.S. at 494, 106 S.Ct. at 2649, 91 L.Ed.2d at 412–13 (emphasis in original), even when the defaulted constitutional claim involved issues "bearing on the reliability of the verdict." *Id.,* at 495, 106 S.Ct. at 2649, 91 L.Ed.2d at 413. Importantly, however, the Court acknowledged that this requirement is not absolute:

> [A]s we also noted in [*Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982) ], "[i]n appropriate cases" the principles of comity and finality that inform the concepts of cause and prejudice "must yield to the imperative of correcting a fundamentally unjust incarceration." 456 US, at 135, 71 LEd2d 783, 102 SCt 1558 [at 1576]. We must remain confident that, for the most part, "victims of a fundamental miscarriage of justice will meet the cause-and-prejudice standard." Ibid. But we do not pretend that this will always be true. Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.

*Id.*

In this case, the trial court's failure to consider a pertinent rule of law resulted in an entire trial addressed to resolving an issue—expressly described at trial in terms of whether Olsen "pledged the credit" of the city by misleading a contractor about his authority to contract for the city—upon which the jury received no instruction at all. The court supplied no guidance as to what legal standard should be applied to assess whether Olsen's actions sufficed to "pledge the credit" of the city or not. More importantly, this issue, upon which much conflicting testimony was received, was an issue upon which no factual dispute is possible, because, as a matter of law, Olsen was incapable of pledging the credit

of the city without first receiving city council authorization.

In short, this is a case in which the failure to instruct the jury correctly has "resulted in the conviction of one who is actually innocent." *Id.* In such a case, "a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Id.*

## VI.

■ Whether couched in terms of a deficient indictment, a failure to instruct the jury on the applicable law, or a retroactive imposition of a new criminal law by an appellate court comparable in effect to an ex post facto law, Olsen's claim at bottom is that he is entitled to the writ of habeas corpus because Ohio's failure to apply its own well-established civil law in his case deprived him of fair notice that what he did was a crime, deprived him of fair notice of what criminal acts he was alleged to have committed, and deprived him of fair notice of what law would be applied to affirm his conviction, all in derogation of his constitutional right to the due process of law.

For excellent reasons, claims that a state erred in interpreting or applying its own criminal law or procedural rules are almost always rejected as grounds for granting the writ of habeas corpus. Examples of cases in which the state-law error did not suffice include: *Henderson v. Kibbe,* 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977), where a jury instruction on an element of the offense was omitted; *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962), where defendant was not afforded the usual procedural assurances of an unbiased grand jury; *Gryger v. Burke,* 334 U.S. 728, 68 S.Ct. 1256, 92 L.Ed. 1683 (1948), where a state court may have misinterpreted a state sentencing law as mandatory rather than discretionary; *Oviedo v. Jago,* 809 F.2d 326 (6th Cir.1987), where a juvenile court failed to follow the rules of evidence; *Mira v. Marshall,* 806 F.2d 636, 639 (6th Cir.1986), where the indictment "fairly but imperfectly" left *mens rea* out of its description of the offense; *Bell v. Arn,* 536 F.2d 123 (6th Cir.1976),

where the trial court admitted a dying declaration identifying the defendant as the murderer; and *Gemmel v. Buchkoe,* 358 F.2d 338 (6th Cir.1966), where the instruction was erroneous.

In some of these cases, the existence of a serious legal error was questionable; in none of these cases did serious unfairness result from the error. Generally, the guilt of the accused was glaringly apparent. All of these cases are therefore clearly distinguishable from the instant case, in which both the magnitude of the legal error and the innocence of the accused are manifest.

Under the extraordinary circumstances of this case, Olsen is entitled to a writ of habeas corpus with respect to his conviction for theft in office. *Murray v. Carrier,* 477 U.S. 478, 494, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397, 413 (1986).

## VII.

Denial of the writ of habeas corpus with respect to Olsen's bad check conviction under Ohio Rev.Code Ann. § 2913.11(A) (1987) is AFFIRMED. Denial of the writ with respect to Olsen's "theft in office" conviction under Ohio Rev.Stat.Ann. § 2921.41(A) (1987) is REVERSED.