67 F.3d 299
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Carlton Lee HARRELSON, Petitioner-Appellant,
v.
David TRIPPETT, Respondent-Appellee.
 No. 95-1199.
 United States Court of Appeals, Sixth Circuit.
 Oct. 2, 1995.
 
 Before: MILBURN, GUY, and SUHRHEINRICH, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Petitioner Carlton Lee Harrelson appeals the district court's order denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. Sec. 2254. On appeal, the issues raised by the petitioner are (1) whether petitioner was denied the effective assistance of counsel on appeal when his appellate counsel failed to raise the remaining issues asserted herein in petitioner's appeal as a matter of right in state court; (2) whether the trial court denied petitioner a constitutionally fair sentence when it: (a) denied him his right of allocution, and (b) enhanced petitioner's sentence based upon the trial judge's belief that petitioner was guilty of first degree murder; and (3) whether petitioner's right to due process of law was denied when the trial court refused to give the Michigan standard jury instruction on reasonable doubt. For the reasons that follow we affirm.
 
 I.
 A.
 
 2
 On Friday, October 21, 1988, petitioner walked into the Atlas (Michigan) Town Hall at approximately 4:00 p.m. He asked for the police and told the receptionist, Kimberly Moors, that he had just shot his girlfriend, Debra Lee Kieffer. The receptionist knew both petitioner and his girlfriend because they had previously obtained various permits at the Atlas Town Hall. He told the receptionist that the shooting had occurred at his home. He also gave the receptionist the garage door opener and the keys to his car, and told the receptionist that the only way to get into his home was through the garage door.
 
 
 3
 The receptionist asked petitioner if he had called an ambulance and he shook his head no. She also asked petitioner if his girlfriend were alive and he shrugged.
 
 
 4
 The receptionist relayed the information she had received from petitioner to the police over the telephone. Shortly after 4:00 p.m., two police officers, one of whom was officer Gary Ellis from Grand Blanc, Michigan, arrived at the Atlas Town Hall. Ms. Moors informed officer Ellis that petitioner had stated that he had shot his girlfriend.
 
 
 5
 The building inspector for Atlas Township, Gordon Bachmann, was in his office at the Atlas Town Hall when petitioner walked in and asked to speak to a police officer. Bachmann observed petitioner walk up to the reception desk and state that he had shot his girlfriend. Petitioner also stated that the shooting had occurred at his home and he gave an address.
 
 
 6
 Officer Barrie Burghdorf of the Davidson City police department was on the road when he received a radio call about the events at the Atlas Town Hall. Officer Burghdorf answered the call and began driving toward the Atlas Town Hall. However, as Officer Burghdorf was advised that Officer Ellis had arrived at the town hall, he travelled to the scene of the shooting, 9406 State Road, in Genesee County, Michigan. An ambulance was waiting at the home when he arrived, and although Officer Burghdorf attempted to enter the home, he was unsuccessful.
 
 
 7
 Shortly thereafter, Officer Ellis arrived at petitioner's home and by using the garage door opener, Officers Burgdorf and Ellis were able to enter the house. They observed the body of a young woman lying on the floor of the family room. As she appeared to be dead, Officer Burgdorf asked one of the ambulance attendants to examine the body for vital signs. Based upon his examination, the ambulance attendant told Officer Burgdorf that he believed the young woman was dead.
 
 
 8
 The body was lying face up and Officer Burgdorf was able to observe a small automatic weapon in the victim's open left hand. Officer Burgdorf, however, did not observe any signs of a struggle.
 
 
 9
 Detective Sergeant Eugene Jenkins photographed the body of Debra Keiffer at the crime scene. He observed wounds to the victim's right wrist and hand and her left temple. He also saw bullet holes in the leather jacket that she was wearing. The gun in the victim's left hand, appeared to be a .25 caliber automatic pistol. Detective Sergeant Jenkins made a detailed observation of the room in which the victim's body was found, and he did not see any bullet holes or any signs of a struggle.
 
 
 10
 The victim's son, Clinton Smith, last saw his mother alive on Thursday, October 20, 1988, before he played in a football game. His mother and petitioner had lived together for approximately three years, and they both owned guns. His mother had a little gun and petitioner had a handgun with a long barrel. Approximately three days prior to her death, Smith's mother moved in with a friend, Sherry LaLonde (a/k/a Sherry Stikeleather), due to a fight with petitioner. Smith, who also lived at petitioner's home, moved out of the house at the same time as his mother. Smith lived with his grandmother, Mary Ann Kieffer, rather than with Sherry LaLonde, because his grandmother lived closer to the school that he attended.
 
 
 11
 The victim's mother, Mary Ann Keiffer, testified that her daughter, who was 34 years of age at the time of her death, was right-handed. She testified that the victim had a lot of pain in her hands, because she had had surgery for carpal tunnel syndrome performed on both hands. Mary Ann Keiffer last saw her daughter on Thursday, October 20, 1988. She also spoke with her on the telephone between 9:00 and 10:00 a.m. on the morning of Friday, October 21, 1988, just before she went to petitioner's house.
 
 
 12
 Sherry LaLonde testified that the victim, her friend for twenty years, had been staying at her home since the Monday prior to her death. She last saw the victim alive when the victim left her house at 10:20 a.m. on the day of her death. LaLonde recalled that several months before the victim's death, she overheard petitioner tell the victim that if she "ever left him he would have her taken care of." J.A. 281. LaLonde also stated that the victim's left hand was disabled because of a disease which had destroyed her circulation.
 
 
 13
 Cathy Light[1], a pathologist, performed an autopsy. Her testimony established that the victim suffered eleven different wounds, caused by the five bullets which struck her. The first two wounds identified by Dr. Light were an entrance wound to the dorsum of the left wrist and exist wound to the palmar surface of the left wrist. The next two wounds were an entrance wound to the dorsum of the right wrist and an exit wound on the palmar surface of the right wrist. Dr. Light stated that "tattooing of the skin around the entrance wound to the right wrist indicated that the wound was a close contact wound fired from less than 12 inches from the body." J.A. 246.
 
 
 14
 There was an entrance wound at the costal margin of the right lower chest and a corresponding exit wound "about 11 inches below the top of the right shoulder and two and a half inches to the right of the midline." J.A. 248. There were also two entrance wounds on the left chest, one "was located approximately four and a half inches below the top of the armpit," and the other "was ... about five inches from the top of the left shoulder and two and a half inches to the left of the midline." J.A. 248. Finally, there was an entrance wound to the left temple of the victim's head.
 
 
 15
 Three bullets were found in the body. They corresponded to the two wounds in the victim's left chest and the wound to her left temple. In addition, the victim had a large L-shaped bruise or abrasion to the right upper portion of her chest. Dr. Light stated that the most likely explanation for the bruise was that at the time the bullet passed through her left wrist, she had her hand up over her chest, and the bullet lost enough velocity in passing through the wrist that it bounced off or ricocheted off of her chest, causing bruising but not penetration of the skin. Dr. Light also testified that the entrance wound to the victim's right lower chest or abdomen was not a clean, virgin bullet wound. She stated that she believed that at the time she was shot, the victim was holding her right hand with the palm toward her lower middle chest just above the waist, and the same bullet passed through her right wrist, into her right lower chest, and out her right shoulder.
 
 
 16
 Dr. Light stated that the victim died due to multiple gunshot wounds. She also stated that the wound to the victim's left temple occurred after the other shots because there was a large amount of bleeding into the victim's chest cavities, but very little bleeding in her head.
 
 
 17
 The handgun which was in the victim's open left hand was a Browning .25 caliber automatic pistol. There were no identifiable fingerprints found on the pistol. The pistol contained seven, unfired bullets, and the safety was in the fire position.
 
 
 18
 Lieutenant Kent Gardner was part of the search team that collected evidence at the scene of the shooting. He obtained two fired bullets. One was in the lining at the back of the leather jacket which the victim was wearing and the other was on the left chest area of the victim. Lieutenant Gardner testified that the bullets were either .38 Special or .357 Magnum caliber bullets, but without a gun to compare them to he could not determine which.
 
 
 19
 Further, a search warrant was executed at petitioner's home. As a result of the search, a box for a .357 Smith and Wesson revolver was found under the bed in the back bedroom of the home. Further, a .45 caliber semi-automatic handgun was found in one of the dressers in the same room. In a different dresser in the same bedroom, a box of .38 caliber, 158 grain, hollow point bullets was found.
 
 
 20
 Petitioner testified that he owned a shotgun and a .357 Smith and Wesson handgun. Approximately a week and a half before the shooting, petitioner moved the handgun from his bedroom. He placed it under the couch in the family room, the room where the shooting occurred. He stated that did this because he had seen an S-10 pickup truck outside his home on two occasions when he returned from work at 11:30 p.m., and he was concerned about prowlers.
 
 
 21
 When petitioner arrived home from work on Monday, October 17, 1988, the victim was not there. At 11:15 p.m. that evening, Sherry LaLonde telephoned petitioner and told him that the victim was staying with her. The next morning, the victim called petitioner and told him that she was returning to his home. He met with the victim and told her that he could not live with her if she kept staying out all night. After, an angry exchange of words, the victim left. On Thursday, October 20, 1988, the victim left petitioner a note saying that she wanted to see him about 10:00 a.m. on Friday to discuss moving out of the house. The victim telephoned petitioner at approximately 9:30 a.m. on Friday and then came to petitioner's house about 11:00 a.m.
 
 
 22
 After the victim arrived, she sat down in a chair in the family room and petitioner sat on the couch. He stated that he told her they could work out their problems if she stopped staying out all night. She replied that she did not think they could work out their problems. He stated that he told her that if she moved out of the house, he would "follow her every weekend everywhere she went until [he] won her love back and she would come back home." J.A. 297.
 
 
 23
 He stated that the victim told him that he was not going to do anything, reached into her purse, and pulled out the .25 caliber automatic handgun with her left hand. He stated that he "went into shock and great fear for [his] life." J.A. 298. He then pulled the .357 handgun out from under the couch and came "around pulling the trigger." J.A. 298. "[H]e did not remember pulling the trigger the first time or how many times he fired." J.A. 298. After he stopped firing, he checked the victim's pulse and did not call an ambulance because he knew she was dead.
 
 
 24
 Petitioner stated that he took the .357 handgun with him. He drove on highway "M-15 south towards I-75." J.A. 299. He was driving the victim's car. He pulled over by a lake and threw the gun into the lake. At around 4:00 p.m. he went to the Atlas Town Hall to turn himself in.
 
 B.
 
 25
 On March 10, 1989, petitioner was convicted by a Genesee County (Michigan) jury of the lesser included offense of second degree murder, in violation of Michigan Compiled Laws ("M.C.L.") Sec. 750.317; and possession of a firearm during the commission of a felony ("felony firearm"), in violation of M.C.L. Sec. 750.227b. Petitioner had been charged with first degree murder and had presented a defense of self-defense at trial. On March 30, 1989, petitioner was sentenced to a mandatory two year term of incarceration on the felony firearm conviction, to be followed by a term of thirty-five to seventy years incarceration on the second degree murder conviction.
 
 
 26
 During the voir dire of prospective jurors, petitioner's counsel asked the trial judge if he could ask the jury some general questions about the concept of reasonable doubt. J.A. 195. The trial judge stated that he had "no problem" with petitioner's counsel doing that, and he indicated that he was not going to use the standard instructions on reasonable doubt, because the requirement of "moral certainty" was being eliminated by the committee drafting criminal jury instructions.[2]
 
 
 27
 Subsequently, during the voir dire, the trial judge defined reasonable doubt to the prospective jurors as follows:
 
 
 28
 [T]he prosecution has the burden of proving each element of a crime beyond a reasonable doubt. This burden does not mean by a mere preponderance of the evidence, but neither does it mean beyond any possible doubt. Reasonable doubt is its own best definition. It means a doubt that is reasonable. If after using your common sense and a consideration of the whole case you have a reasonable doubt that the defendant is guilty you should find him not guilty.
 
 
 29
 J.A. 138. This same instruction on reasonable doubt was repeated to the jury at the close of the case. J.A. 311. In addition, the jury was instructed that petitioner should be found not guilty, "if the evidence of good character along with all of the evidence in the case created a reasonable doubt," J.A. 314, and that the prosecution must prove each of the essential elements of either first degree or second degree murder beyond a reasonable doubt, J.A. 316-18. Petitioner's counsel did not object to any of the instructions.
 
 
 30
 The presentence report, which was prepared pursuant to the Michigan Sentencing Guidelines, indicated that the sentence guidelines for petitioner's second degree murder conviction resulted in a range of eight to twenty five years in prison. However, the trial judge imposed a sentence of thirty-five to seventy years.
 
 
 31
 Prior to imposing sentence, the trial judge described his view of the evidence, see J.A. 366-67, and stated:
 
 
 32
 Now, if that isn't first degree murder I never heard it. Therefore, I think there is record support that a greater offense has been committed than the one found by the jury beyond a reasonable doubt, and that I can properly consider it an aggravating factor to be considered and can therefore appropriately deviate from the guidelines ... I am going to make [the sentence for second degree murder] 35 years, which is ten years longer than the guidelines provide, because of this aggravating factor that I have explained, and only because of that....
 
 
 33
 J.A. 368. Thereafter, petitioner's counsel interrupted the court to point out that petitioner had not been accorded his right to allocution, and the trial judge stated:
 
 
 34
 I will listen to what he has to say and give him his right to allocution before my final decision as to what the sentence should be.
 
 
 35
 J.A. 368-69. After petitioner spoke, the trial court sentenced petitioner to serve two years for the felony firearm conviction, and after completing that sentence, "to serve not less than 35, nor more than 70 years in the state prison for the crime of second degree murder." J.A. 370.
 
 
 36
 Petitioner, who had the same counsel as at trial, appealed as a matter of right to the Michigan Court of Appeals, raising three issues: (1) the trial court improperly instructed the jury on first degree murder because it was unsupported by the evidence, (2) reversible error was committed due to the improper admission of hearsay testimony, and (3) the trial court erred in sentencing him to a term of years that exceeded his life expectancy. Petitioner's convictions and sentences were affirmed on July 27, 1990. On March 29, 1991, discretionary review was denied by the Michigan Supreme Court.
 
 
 37
 On January 6, 1992, petitioner, having retained new counsel, filed a motion for relief from judgment in the trial court alleging: (1) a constitutionally unfair sentence due: (a) to the trial judge's denial of the right to allocution; (b) because the trial judge improperly based his sentence on a belief that he was guilty of first degree murder; and (c) that his sentence exceeded the sentencing guidelines thereby violating the proportionality principles of People v. Milbourn, 435 Mich. 630 (1990); (2) a violation of due process because the trial judge refused to give the standard jury instruction on reasonable doubt; and (3) a denial of the right to appeal due to appellate counsel's ineffectiveness in failing to raise the issues presented in the motion for relief from judgment in the appeal of right. On January 31, 1992, the trial court issued an opinion denying the motion for relief from judgment because petitioner's claims had either been previously raised and decided adversely to him or he could not establish prejudice under Michigan Court Rules ("M.C.R.") 6.508(D)(2) & (3).[3]
 
 
 38
 On February 20, 1992, petitioner filed an application for leave to appeal in the Michigan Court of Appeals. In an order dated July 16, 1992, petitioner's application for leave to appeal was denied by the Michigan Court of Appeals. He subsequently filed an application for leave to appeal to the Michigan Supreme Court which was denied "because defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." J.A. 68.
 
 
 39
 On July 20, 1993, petitioner filed his petition for a writ of habeas corpus in the district court, raising the same three issues he had raised in the state appellate courts. The matter was referred to a magistrate judge, who on May 13, 1994, issued a report and recommendation that the petition be dismissed because of petitioner's procedural default in failing to raise the issues in his appeal as of right and his failure to establish "cause" for the procedural default. After de novo review, the district court issued an order on February 9, 1995, denying the petition on the ground that petitioner could not establish "cause" for his failure to raise the issues raised in his habeas petition in his appeal as a matter of right. This timely appeal followed.
 
 II.
 A.
 
 40
 Petitioner argues that the district court erred in finding that habeas review was precluded because he had failed to establish "cause" for his procedural default in state court. Specifically, he asserts that the failure of his appellate counsel to raise these issues in his appeal as a matter of right, constitutes "cause" for his procedural default and resulted in "prejudice" to him.
 
 
 41
 We review a denial of a petition for a writ of habeas corpus de novo. Clemmons v. Sowders, 34 F.3d 352, 354 (6th Cir.1994); McBee v. Abramajtys, 929 F.2d 264, 266-67 (6th Cir.1991). "[W]e review federal district court findings of fact for clear error." Clemmons, 34 F.3d at 354 (citing Carter v. Sowders, 5 F.3d 975, 978 (6th Cir.1993), cert. denied, 114 S.Ct. 1867 (1994)). Moreover, "[p]ursuant to the 28 U.S.C. Sec. 2254(d) presumption of correctness, we give complete deference to district and state court findings supported by the evidence." Id. (citing Sumner v. Mata, 455 U.S. 591, 597 (1982)). "To obtain habeas corpus relief, the petitioner must establish 'actual prejudice.' " Clemmons, 34 F.3d at 354 (citing Brecht v. Abrahamson, 113 S.Ct. 1710, 1722 (1993)). "Though a petitioner must establish a constitutional error to obtain habeas relief, a constitutional error is deemed harmless unless it had a 'substantial and injurious effect or influence in determining the jury's verdict.' " Id. (quoting Brecht, 113 S.Ct. at 1722). "To warrant habeas relief, there must be an error which results 'in the denial of fundamental fairness, thereby violating due process.' " Clemmons, 34 F.3d at 356 (quoting Cooper v. Sowders, 837 F.2d 284, 286 (6th Cir.1988)).
 
 
 42
 "If a habeas corpus petitioner is barred from presenting one or more of his claims to the state courts because of procedural default, he has waived those claims for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error." Rust v. Zent, 17 F.3d 155, 160 (6th Cir.1994). "[W]e may not consider [a petitioner's] constitutional claims unless he can show cause to excuse his failure to present [his] claims in state court and actual prejudice to his defense at trial or on appeal." Id. "We will consider the cause and prejudice test if the last state court to review [a petitioner's] conviction 'clearly and expressly' relied on [petitioner's] procedural default in its decision affirming the petitioner's conviction or if the last state court to review [petitioner's] conviction affirmed the conviction on the merits and, alternatively, on procedural grounds." Rust, 17 F.3d at 161 (citing Harris v. Reed, 489 U.S. 255, 262-63 & 264 n. 10 (1989)). Further, " '[w]here, ... the last reasoned opinion on the claim explicitly imposes a procedural default, we will presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.' " Id. (quoting Ylst v. Nunnemaker, 501 U.S. 797, ----, 111 S.Ct. 2590, 2594 (1991)).
 
 
 43
 "Attorney error does not constitute cause ... unless it constitutes ineffective assistance of counsel under the test enunciated in Strickland v. Washington ", 466 U.S. 668 (1984). Rust, 17 F.3d at 161 (quoting Coleman v. Thompson, 501 U.S. 722, 752-53 (1991). "Though ineffective assistance of counsel may constitute cause, 'the mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default.' " Rust, 17 F.3d at 161 (quoting Murray v. Carrier, 477 U.S. 478, 486-87 (1986)). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Carrier, 477 U.S. at 488. "A showing that a factual or legal basis for a claim was not reasonably available to counsel or that 'some interference by officials' made compliance impracticable, would constitute cause." Carrier, 477 U.S. at 488 (citations omitted). Moreover, on appeal "the attorney need not advance every argument, regardless of merit, urged by the appellant." Evitts v. Lucey, 469 U.S. 387, 394 (1985).
 
 
 44
 A petitioner must also prove that he suffered actual prejudice from the alleged constitutional error. See United States v. Frady, 456 U.S. 152, 170 (1982). However, "the prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim." Rust, 17 F.3d at 161-62 (citing Frady, 456 U.S. at 172).
 
 
 45
 In this case, the state court's decision not to review the issues in petitioner's motion for relief from judgment rests on adequate and independent state grounds. Petitioner asserts, relying on the Supreme Court's decision in Collins v. Youngblood, 497 U.S. 37 (1990), that his habeas claims should be reviewed because the prosecution did not present objections based on procedural default grounds in the state courts, and the Michigan courts should not have denied relief based on his procedural default when the State did not raise it below. In Collins, the State of Texas deliberately chose not to raise the issue of retroactivity either in its petition or in its briefs before the Supreme Court. Collins, 497 U.S. at 41. However, under M.C.R. 6.506 the prosecution need not respond to a motion for relief from judgment unless directed to do so. Petitioner does not allege that the trial court directed the state to respond to his motion for relief from judgment. Thus, Collins is distinguishable from this case because the issue of deliberate forbearance by the State of Michigan is absent. Further, petitioner's claim that the Michigan courts erred in applying their own procedural rules is not a basis for habeas relief. "A federal court is not free to issue a writ of habeas corpus 'on the basis of a perceived error of state law.' " Smith v. Sowders, 848 F.2d 735, 738 (6th Cir.) (quoting Pulley v. Harris, 465 U.S. 37, 41 (1984)), cert. denied, 488 U.S. 866 (1988). See also Olsen v. McFaul, 843 F.2d 918, 933 (6th Cir.1988) ("For excellent reasons, claims that a state erred in interpreting or applying its own criminal law or procedural rules are almost always rejected as grounds for granting the writ of habeas corpus.").
 
 
 46
 Further, the Michigan courts, particularly the trial court and the Michigan Supreme Court, explicitly relied on the procedural bar resulting from petitioner's failure to raise these claims in his direct appeal. In his opinion, denying petitioner's motion for relief from judgment, the trial judge found that the record showed that petitioner had been afforded his right to allocution, that appellate counsel had raised the issue of proportionality at the earliest possible opportunity, namely, in the Michigan Supreme Court after its decision in People v. Milbourn, 435 Mich. 630 (1990), and that the standard criminal jury instructions were not law and did not have to be given. Further, the trial court also found that petitioner had failed to meet his burden of demonstrating actual prejudice stemming from his procedural default in failing to raise these issues in his direct appeal. Moreover, the Michigan Supreme Court denied review based upon petitioner's failure to comply with M.C.R. 6.508(D). Thus, the cause and prejudice test applies in this case because the last state court to review petitioner's conviction, "clearly and expressly" relied on petitioner's procedural default in affirming the conviction. Harris, 489 U.S. at 263.
 
 B.
 
 47
 In his habeas petition and on appeal, petitioner argues that ineffective assistance of counsel, namely, counsel's failure to raise these new claims in his direct appeal, constitutes cause for his procedural default. However, petitioner has failed to present any evidence that some objective factor external to his defense impeded his counsel's efforts to raise these claims. Thus, we agree that the district court correctly rejected petitioner's assertion of attorney error on appeal as cause for his failure to raise these claims in his direct appeal. Nevertheless, in its opinion the district court speculated that because petitioner, "had the same appellate counsel before the Michigan Supreme Court as he had before the Michigan Court of Appeals, the attorney obviously had little incentive to tell the Michigan Supreme Court that he had been constitutionally ineffective before the Michigan Court of Appeals." J.A. 17.
 
 
 48
 We do not believe that any supposed reluctance on the part of appellate counsel to argue that he rendered ineffective assistance of counsel at trial or on appeal, is an objective external factor to the defense which would constitute "cause" for petitioner's procedural default. Nevertheless, if we were to assume, merely for the sake of argument, that it did constitute "cause" for the procedural default, petitioner cannot demonstrate "actual prejudice."
 
 
 49
 As earlier stated, "the prejudice component of the cause and prejudice test is not satisfied if there is strong evidence of a petitioner's guilt and a lack of evidence to support his claim." Rust, 17 F.3d at 161-62 (citing Frady, 456 U.S. at 172). In this case, there is overwhelming evidence of petitioner's guilt.[4] It is undisputed that petitioner shot the victim, firing five bullets which produced eleven wounds. Further, strong evidence rebuts the petitioner's claim of self-defense. Although petitioner claims that the victim pulled a gun on him and that she held it in her left hand, the evidence shows that she had a problem with her hands, particularly the left, due to circulatory problems and surgery for carpal tunnel syndrome. In addition, the testimony of Dr. Light, who performed the autopsy, establishes that at the time plaintiff was shot through the left wrist, her left hand was being held palm down against her right chest. Further, at the time she was shot through her right wrist, her right hand was being held palm down against her lower right abdomen. This is inconsistent with the claim that the victim was shot as she was aiming a gun at petitioner. Finally, the evidence of prejudice in this situation is less than strong.[5] Thus, we conclude that even if petitioner could establish "cause" for his procedural default, he would be unable to establish "actual prejudice."
 
 III.
 
 50
 For the reasons stated, the district court's judgment dismissing the petition for habeas corpus is AFFIRMED.
 
 
 
 [1]
 Dr. Light is also referred to as Dr. Blight in the record. See J.A. 239
 
 
 [2]
 At that time, the standard jury instruction on reasonable doubt in Michigan stated:
 A reasonable doubt is a fair, honest doubt growing out of the evidence or lack of evidence in this case or growing out of any reasonable or legitimate inferences drawn from the evidence or lack of evidence. It is not merely an imaginary doubt or a flimsy, fanciful doubt or a doubt based upon the mere possibility of the innocence of the defendant or a doubt based upon sympathy, but rather it is a fair, honest doubt based upon reason and common sense. It is a state of mind which would cause you to hesitate in making an important decision in your own personal life. By stating that the prosecution must prove guilt beyond a reasonable doubt, I mean there must be such evidence that causes you to have a firm conviction to a moral certainty of the truth of the charge here made against this defendant.
 People v. Jackson, 421 N.W.2d 697, 699 n. 1 (Mich.App.1988) (quoting Michigan Criminal Jury Instruction 3:1:04) (per curiam).
 
 
 [3]
 M.C.R. 6.508(D) states in relevant part:
 The defendant has the burden of establishing entitlement to the relief requested. The court may not grant relief to the defendant if the motion
 * * *
 (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
 (a) good cause for failure to raise such ground on appeal or in the prior motion, and
 (b) actual prejudice from the alleged irregularities that supports the claim for relief. As used in this subrule, "actual prejudice" means that,
 (i) in a conviction following a trial, but for the alleged error, the defendant would have had a reasonably likely chance of acquittal;
 M.C.R. 6.508 (West 1995).
 
 
 [4]
 Thus, this case is distinguishable from the situation presented in O'Neal v. McAnich, 115 S.Ct. 992 (1995). In O'Neal the Court stated that "[w]hen a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless," and the writ of habeas corpus must issue. Id. at 995. However, in this case we have no doubt, much less grave doubt, that petitioner cannot establish cause and prejudice for his procedural default. Accordingly, we conclude that the decision in O'Neal does not compel the issuance of the writ of habeas corpus
 
 
 [5]
 In its opinion, the district court stated that it found good reason to believe that if petitioner had presented his claims that he was denied his right of allocution to the Michigan appellate courts he would have received a resentencing. We disagree. Nevertheless, we note that whether or not petitioner is entitled to resentencing under Michigan law, even if a denial of allocution had occurred, it would not support the issuance of a writ of habeas corpus. The Supreme Court has recognized that "a sentencing judge's failure to ask a defendant if he had anything to say, although a violation of [Federal Rule of Criminal Procedure] 32(a)(1)(C), was not an error of Constitutional dimension and could not support a writ of habeas corpus." Boardman v. Estelle, 957 F.2d 1523, 1526 (9th Cir.) (citing Hill v. United States, 368 U.S. 424 (1962)), cert. denied, 113 S.Ct. 297 (1992)