*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0161P (6th Cir.)
File Name: 01a0161p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

CHARLES WILSON,
　　　　*Petitioner-Appellant,*

　　　*v.*

No. 99-4375

BETTY MITCHELL, Warden,
　　　　*Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 98-00131—Kathleen McDonald O'Malley, District
Judge.

Argued: March 14, 2001

Decided and Filed: May 14, 2001

Before: COLE and GILMAN, Circuit Judges; BORMAN,
District Judge.

———————————

## COUNSEL

**ARGUED:** Paul Mancino, Jr., MANCINO, MANCINO &
MANCINO, Cleveland, Ohio, for Appellant. Jonathan R.

———————————

＊The Honorable Paul D. Borman, United States District Judge for the
Eastern District of Michigan, sitting by designation.

1

Fulkerson, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee. **ON BRIEF:** Paul Mancino, Jr., MANCINO, MANCINO & MANCINO, Cleveland, Ohio, for Appellant. Laurence R. Snyder, OFFICE OF THE ATTORNEY GENERAL, CORRECTIONS LITIGATION SECTION, Cleveland, Ohio, for Appellee.

———————————

## OPINION

———————————

RONALD LEE GILMAN, Circuit Judge.  Charles Wilson appeals the district court's denial of his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254.  Wilson was convicted of first-degree murder and three counts of armed robbery, all arising out of a shooting at a gas station in 1972.  In this appeal, Wilson sets forth four assignments of error.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.   Factual background

On December 17, 1972, Wilson drove his father's car to a local gas station in Cleveland, Ohio to be serviced.  Wilson paid for the maintenance of the car with a stolen check, which the owner of the station, Willie Binford, discovered after Wilson left.  Later that day, Wilson returned to the gas station to complain about the repairs Binford's employees had made.  Binford confronted Wilson about the bad check, insisting that Wilson would have to "make good" on the now-unpaid balance.  Wilson reacted by shooting Binford in the head and neck with a firearm.  After robbing Binford and two other employees, Wilson proceeded to take money from the cash register and flee the scene of the crime.

Wilson was charged with the first-degree murder of Binford in February of 1973.  An arrest warrant was issued soon

improper prosecutorial statements, we look at the existence of objections, curative instructions, the likelihood that a jury will be misled as a result of the remarks, and the strength of the evidence against the defendant.  *See id.*

The statements in question constituted prosecutorial vouching for a witness's credibility, or statements by the prosecutor that the government had met its burden of proof.  Both of these types of statements are improper.  *See United States v. Fullerton,* 187 F.3d 587, 592 (6th Cir. 1999) (holding that statements by the government that "[t]his case is beyond a reasonable doubt" were improper but harmless); *United States v. Piva*, 870 F.2d 753, 760 (1st Cir. 1989) (holding that prosecutorial vouching for a witness's credibility was both improper and harmless).

In the present case, Wilson's lawyer objected to each of the claimed improper statements, and the state trial court overruled most of them.  Only once did the court admonish the jury that "[i]t's for the jury to determine the evidence."  Nevertheless, where the evidence against a defendant is otherwise strong, this court has held that such statements constitute harmless error.  *See Fullerton*, 187 F.3d at 592.  The state of Ohio presented sixteen witnesses, at least one of whom was an eyewitness to the armed robbery.  Given the sizeable amount of proof proffered by the state, it is unlikely that the jury was misled as a result of the state's vouching for some of its witnesses.  Because the evidence against Wilson was strong, we cannot say that the prosecutor's statements were "so fundamentally unfair as to deny him due process." *Kincade*, 175 F.3d at 446.  We therefore find no error in the district court's denial of habeas corpus based on the prosecutor's closing argument.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court denying Wilson's petition for a writ of habeas corpus.

reliability analysis, however, the Ohio Court of Appeals held that "defendant has failed to show that Watson's pretrial identification was [so] unreliable [as] to warrant suppressing the evidence." *Wilson*, 1997 WL 127186 at *4. Although this issue is indeed a close call, we may not grant a habeas petition simply because we might disagree with the conclusion of the state court. *See* 28 U.S.C. § 2254(d)(1); *Williams v. Taylor*, 529 U.S. 362, 410-11 (2000). Furthermore, much of our deference to the state court's determination is based on Watson's three-hour observation of Wilson on the day of the shooting and Watson's assurance that he was certain that his identification was correct. If not for this unusually prolonged opportunity to observe Wilson, our conclusion might well have been different.

We conclude, then, that the Ohio Court of Appeals did not unreasonably apply the due-process analysis to the out-of-court identification procedures in question, and we agree with the district court's decision to deny Wilson's habeas corpus petition based on his claim of an unconstitutional out-of-court identification. Furthermore, we reject Wilson's claim that Watson's observation of him on the first day of trial further contaminated Watson's identification. Again, Watson's three-hour observation of Wilson on the day of the shooting overshadows the concerns that we might otherwise have as to the appropriateness of these pre-identification contacts.

**E.   The prosecutorial statements made during closing arguments did not render the trial so fundamentally unfair as to warrant granting the writ of habeas corpus**

This court has been reluctant to grant habeas petitions based on improper prosecutorial statements at closing argument. Indeed, we may not grant such collateral relief unless we "find that the prosecutor's comments constituted more than simply trial error under state law. The misconduct must be 'so fundamentally unfair as to deny [the defendant] due process.'" *Kincade v. Sparkman*, 175 F.3d 444, 445-46 (6th Cir. 1999) (citations omitted). When evaluating claims of

thereafter, but Wilson was not arrested until February 17, 1995, after which he was also indicted for three counts of armed robbery. The cause of the 22-year delay is one of the key issues on appeal.

According to Wilson, the delay was due to the police department's failure to exercise reasonable diligence in pursuing the arrest warrant. Wilson identified five witnesses who claimed that they knew of Wilson's whereabouts after the murder, but that the police never questioned them about their knowledge of Wilson until shortly before the trial in 1995, if at all. Each of those witnesses was proffered by Wilson, and all but one testified at the hearing on his motion to dismiss the charges.

The state, on the other hand, contends that Wilson

> escaped apprehension, despite reasonable investigation, by using at least (1) thirteen different name variations, (2) five different addresses, and (3) two social security numbers, in addition to (4) changing his physical appearance, and (5) date of birth. Defendant's name, social security number, date of birth and address changed between the time of the crimes and five months thereafter when defendant completed an employment application.

*State v. Wilson*, No. 69346, 1997 WL 127186, *2 (Ohio Ct. App. March 20, 1997). As evidence of its reasonable attempts to apprehend Wilson, the state produced records indicating that

> after the incident officers contacted numerous witnesses, including defendant's father, mother, and stepmother; his current and former schools, Cuyahoga Community College, East Tech High School; and his current employer, Ford Motor Company. The police also issued a nationwide all-points bulletin for defendant under the name of "Charles Wilson" and followed up on responses received.

*Id*. Nevertheless, although the police actively pursued the case between 1973 and 1979, there is no evidence that there was any attempt to locate Wilson thereafter until shortly before his arrest in 1995.

Wilson filed a pretrial motion to dismiss based on the 22-year delay between the 1973 arrest warrant and the 1995 trial, as well as a motion to suppress his identification as the perpetrator by one of the state's key witnesses, Donnell Watson. Watson, who had been an employee of the gas station when the murder occurred, was prepared to identify Wilson as the one who committed the crime. Although Watson did not witness the murder, he had observed Wilson over a period of three hours prior to the crime while Wilson waited for the repairs on his father's car to be completed. At the time of the crime, Watson described the assailant as "5'4" with a big Afro." Wilson challenged the 1995 out-of-court identification as being unconstitutionally suggestive because Watson was shown only two pictures, one of which was of an African-American male with close-cropped hair and the other of an African-American male (Wilson) with an Afro haircut.

The state trial court rejected both motions. In denying the motion to dismiss, "the trial court specifically found him to be a fugitive who repeatedly changed his identity, name, physical appearance, and whereabouts to avoid being brought to trial on the charges." *Wilson*, 1997 WL 127186 at *2.

The prosecution called sixteen witnesses at trial, with Wilson presenting no contrary proof. During closing argument, the prosecution made numerous remarks that Wilson challenges on appeal. The magistrate judge summarized the statements in question as follows:

> [T]he prosecutor vouched for the credibility of his witnesses when claiming that the state "had proven each and every element of every crime charged"; [] concerning a witness named Mary Wenderoth (Kelly), the prosecutor stated her "testimony is credible . . .and she's correct in her opinion;" [] the prosecutor stated that Wilson was "proven guilty beyond a reasonable, beyond any doubt;"

Even if this identification is deemed to be unduly suggestive, it can only be excluded if the procedure throws into doubt the reliability of the witness's testimony. *See Biggers*, 409 U.S. at 199-200. The first reliability factor to consider is the length of time the witness had to observe the suspect during the pendency of the crime. *See Russell*, 532 F.2d at 1066 ("There is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement."). In the present case, the witness had up to three hours prior to the crime in which to observe Wilson. This amount of time is unusually long, did not occur under great stress, and therefore weighs in favor of the reliability of Watson's identification. *Cf. Webb v. Havener*, 549 F.2d 1081, 1086 (6th Cir. 1977) (expressing concern for the reliability of an identification based on an observation of only a few minutes).

There is nothing in the state-court opinion indicating Watson's degree of attention during the three hours that he observed Wilson in 1972, nor is there anything in the record to aid us in determining the accuracy of his description of Wilson prior to the 1995 identification. Accordingly, we turn to the next reliability consideration – Watson's level of certainty at the time of his identification. The magistrate judge's Report and Recommendation states that "[u]pon being shown two photographs in 1995, one of which was Wilson, Watson said he was positive and had no doubt that the photograph of Wilson was the individual that he saw at the gas station." This level of certainty weighs in the state's favor, supporting the reliability of the identification. Finally, *Biggers* requires us to consider the amount of time between the crime and the identification. Because over two decades had elapsed between the murder and the identification, this factor clearly favors Wilson's claim that the identification was prone to error.

The *Biggers* totality-of-the-circumstances considerations, as applied to this case, do not tip overwhelmingly in favor of or against Wilson's claim of unreliability. Applying this

When reviewing a petitioner's claim that an out-of-court identification violated his or her due process rights, a court's primary concern is with the reliability of the evidence. *See Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). A two-part inquiry that governs such claims of error has emerged. "First, the court evaluates the undue suggestiveness of the pre-identification encounters." *Thigpen v. Cory*, 804 F.2d 893, 895 (6th Cir. 1986). Second, if the identification procedures are found to be unduly suggestive,

> [w]e turn, then, to the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive. As indicated by our cases, the factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199-200 (1972).

The first factor in this due-process analysis – the suggestiveness of the identification procedure – questions whether the procedure itself steered the witness to one suspect or another, independent of the witness's honest recollection. *See United States v. Russell*, 532 F.2d 1063, 1068 (6th Cir. 1976) (holding that an identification procedure was unduly suggestive because a witness identified the suspect by the process of elimination, with the police giving her another chance to make the identification after her first selection was not the person the police believed to be the guilty party).

In the present case, Watson was presented with two photographs, only one of which was a picture of a man (Wilson) with the same hair style as the assailant described by Watson. The district court concluded that this procedure was suggestive; the Ohio Court of Appeals did not. *See Wilson*, 1997 WL 127186 at *4.

[] the prosecutor referred to three fact witnesses who "testified credibly, truthfully and reliably;" [] the prosecutor argued that when defendant got arrested he shaved his head; [and] the prosecutor referred to the fact there "is murder after murder in the city" which has to be investigated with a "limited number of police officers[.]"

Wilson was found guilty on the murder count, as well as on the three counts of armed robbery. After entering judgment, the trial court sentenced Wilson to life imprisonment on the murder conviction and 7 to 25 years on each of the robbery convictions, all to be served consecutively.

## B.   Procedural background

Wilson filed a timely appeal of his conviction to the Ohio Court of Appeals, raising eight claims of error. His conviction was affirmed. *See State v. Wilson*, 1997 WL 127186 (Ohio Ct. App. March 20, 1997). Wilson's leave to appeal the decision was dismissed by the Ohio Supreme Court. *See State v. Wilson*, 681 N.E.2d 440 (Ohio July 16, 1997) (unpublished table decision).

On January 21, 1998, Wilson filed his petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. The petition was timely filed. *See* 28 U.S.C. § 2244(d) (establishing a one-year statute of limitations on all habeas petitions). On August 17, 1999, the magistrate judge issued a Report and Recommendation, ruling that Wilson's ten claims of error were without merit and should be denied. The Report and Recommendation was adopted by the district court on September 29, 1999, and the petition was dismissed. In its order, the district court granted a certificate of appealability on three of Wilson's claims: (1) the speedy-trial claim, (2) the statute-of-limitations claim as to the armed-robbery counts, and (3) the challenge to the propriety of the prosecution's statements during closing argument. This court, on January 26, 2000, expanded Wilson's certificate to include his challenge to the out-of-court photo-identification procedure.

## II. ANALYSIS

### A.  Standard of review

A federal court is authorized to grant a writ of habeas corpus to a person in custody pursuant to a state-court judgment, but only if

> the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  The Supreme Court has declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000).  In its elaboration on the meaning of the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.    Rather, that application must also be unreasonable." *Id*. at 411.  Finally, a district court's denial of the writ is subject to de novo review. *See Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998).

### B.  Wilson's constitutional right to a speedy trial was not denied

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."  U.S. Const. Amend. VI; *see also Klopfer v. North Carolina*, 386 U.S. 213 (1967) (holding that the right to a speedy trial is incorporated through the Fourteenth Amendment and thus applies to the states).  A claim that the state has violated this constitutional guarantee is a fact-

run during any time when the accused purposely avoids prosecution." *See Wilson*, 1997 WL 127186 at *3.  Wilson failed to address the applicability of § 2901.13(G) in his arguments on appeal.

This court has declared that "[f]or excellent reasons, claims that a state erred in interpreting or applying its own criminal law or procedural rules are almost always rejected as grounds for granting the writ of habeas corpus." *Olsen v. McFaul*, 843 F.2d 918, 933 (6th Cir. 1988).  In *Olsen*, this court granted habeas corpus where the state court misapplied a rule of substantive criminal law, but only because "the magnitude of the legal error and the innocence of the accused [were] manifest." *Id*.  By comparison, Wilson's statute-of-limitations argument has no apparent merit and Wilson's actual innocence is hardly manifest.  We therefore find no error in the district court's denial of habeas corpus based on Wilson's statute-of-limitations argument.

### D.  The state court's decision to admit Watson's identification of Wilson was not objectively unreasonable

Wilson next challenges the admissibility of the out-of-court identification by Donnell Watson.  Watson, who was in the gas station when the murder occurred, observed Wilson over a period of three hours while Wilson waited for his father's car to be repaired.  After Binford was shot, Wilson then robbed Watson at gunpoint. *See Wilson*, 1997 WL 127186 at *4.  Nevertheless, Watson was not asked to identify Wilson until shortly before the trial, over two decades after the crime was committed.  Watson, who had stated at the time of the crime that the person he saw commit the crime was "5'4" with a big Afro," was presented with two pictures in 1995, only one of which was of a man with an Afro haircut. Wilson also claims that the identification was further tainted because Watson watched the first day of the trial, and was given the opportunity to observe Wilson before taking the stand.  The Ohio Court of Appeals rejected these arguments. *Id*. at *4-5.

proven, "our toleration of . . . negligence varies inversely with its protractedness . . . and its consequent threat to the fairness of the accused's trial." *Doggett*, 505 U.S. at 657. In other words, the longer the delay that is traceable to the state's conduct, the more prejudice that will be presumed. Where, however, as in Wilson's case, the delay is overwhelmingly due to his own evasion, he is not entitled to a presumption of prejudice. He instead must produce evidence showing that he was actually prejudiced by the delay. This court has declared that "[a]ctual prejudice is determined by examining whether the defendant has suffered (1) oppressive pretrial incarceration; (2) anxiety and concern; and (3) impairment to his defense." *United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999).

Wilson's only allegation of prejudice is that his father died in 1979, and was therefore unavailable to testify as to the whereabouts of the car on the day of the murder. Nothing about this allegedly unavailable testimony, however, suggests that if it had been presented to the jury, the outcome of the trial would have been any different. The prejudice prong, therefore, weighs in favor of the state.

Taking all of the above factors into account, we conclude that the district court did not err in denying Wilson's petition based on his speedy-trial claim.

## C.    The Ohio statute of limitations did not bar the state's prosecution of Wilson for armed robbery

Wilson claims that he was denied procedural due process when he was prosecuted in 1995 for crimes that were committed in 1972. He argues that Ohio Revised Code § 2901.13(A)(1), which imposes a six-year statute of limitations on the prosecution of felonies, should have been a bar to the prosecution of his three armed-robbery charges. (There is no statute of limitations for murder. *See* Ohio Rev. Code Ann. § 2901.13(A)(2)). When confronted with this claim of error on direct appeal, the Ohio Court of Appeals rejected the argument, pointing out that § 2901.13(G) specifically provides that "[t]he period of limitation shall not

intensive inquiry requiring the balancing of (1) "whether [the] delay before trial was uncommonly long," (2) "whether the government or the criminal defendant is more to blame for that delay," (3) "whether, in due course, the defendant asserted his right to a speedy trial," and (4) "whether he suffered prejudice as the delay's result." *Doggett v. United States*, 505 U.S. 647, 651 (1992) (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)).

The first step in this balancing test, the length of the delay, is the triggering factor because "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. This first prong of the *Barker* test is not disputed in the case before us. Twenty-two years is an extraordinary delay that far exceeds this court's guideline that a delay longer than a year is presumptively prejudicial. *See United States v. Mundt*, 29 F.3d 233, 235 (6th Cir. 1994).

Next, we must identify the reason for the delay. *See Barker*, 407 U.S. at 531. This analysis is important because it determines the amount of proof that a petitioner must proffer in order to show prejudice. *See United States v. Brown*, 169 F.3d 344, 350-51 (6th Cir. 1999) (holding that the Sixth Amendment was violated because a five-year pretrial delay was primarily attributable to the government's negligence). In our evaluation of this claim of error, we are governed by the evidentiary standard set forth in the Antiterrorism and Effective Death Penalty Act of 1996:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. 2254(e)(1).

Wilson has failed to produce any evidence that places in dispute the trial court's determination that he vigorously evaded apprehension and discovery by the police for 22 years. Instead, Wilson has produced evidence suggesting that the state did not pursue every avenue available to it in searching for him. None of Wilson's evidence calls into question the trial court's conclusion that Wilson was "a fugitive who repeatedly changed his identity, name, physical appearance, and whereabouts to avoid being brought to trial on the charges." *Wilson*, 1997 WL 127186 at *2. Thus, because he did not adduce clear and convincing evidence that contradicted the trial court's factual determination, we must presume that the finding of Wilson's active evasion was correct.

What we are presented with, then, is a case in which blame for the 22-year delay can be placed on both Wilson and the state. This inquiry, however, is not a search for a blameless party. We are instead concerned with who "is more to blame for that delay." *Doggett*, 505 U.S. at 651. In *Doggett*, the Supreme Court discussed the extent to which a defendant must prove prejudice from a delay in prosecution. The amount of proof required is directly related to the state's reasonableness in its pursuit of a defendant. When a defendant is pursued with reasonable diligence, the speedy-trial claim fails. *Id*. at 656. If, however, the state's pursuit was intentionally dilatory, these bad-faith tactics weigh heavily in favor of the defendant's speedy-trial claim. *Id*. In between these two extremes, the *Doggett* Court held that the government's negligence requires toleration by the courts that "varies inversely with its protractedness . . . and its consequent threat to the fairness of the accused's trial." *Id*. at 657. Thus, the success of a speedy-trial challenge typically turns on the state's conduct and the injury resulting from that conduct.

What *Doggett* does not answer, however, is the extent to which a defendant's attempt to evade discovery affects the Sixth Amendment analysis. We believe that the Court's usage of tort-law terminology in *Doggett* and *Barker* is

particularly apt, and invites another tort analogy from the doctrine involving indemnity between two tortfeasors. Under general tort-law principles, an active tortfeasor is not entitled to either indemnity or contribution from a passive tortfeasor. *See, e.g.*, 18 Am. Jur. 2d. *Contribution* § 50 (1985).

Assuming then, as we must, that Wilson actively evaded discovery by changing his identity and appearance, and assuming that Wilson is correct in his contention that the police did not exercise reasonable diligence in their pursuit of him, we are presented with an analogous situation. We have an active wrongdoer (Wilson) and a passive wrongdoer (the state), both of whom are at fault for a 22-year delay between Wilson's indictment and arrest. Nevertheless, under our tort analogy, because Wilson actively evaded discovery, and the state was, at worst, passive in its pursuit of him, we cannot attribute the primary responsibility for the delay to the state. Indeed, even if the police made mistakes in their search for Wilson, he is not entitled to relief on this ground so long as his active evasion "is more to blame for that delay." *Doggett*, 505 U.S. at 651; *compare United States v. Graham*, 128 F.3d 372, 375 (6th Cir. 1997) (holding that the government was primarily responsible for an eight-year delay, even though the defendant's requests for extensions and continuances also prolonged the trial process for a couple of months).

The third factor in the speedy-trial analysis calls on us to determine whether the defendant timely asserted his Sixth Amendment rights. *See Barker*, 407 U.S. at 531-32. It is undisputed that, through his motion to dismiss the indictment, Wilson has properly raised an objection on the basis of his right to a speedy trial. This factor, therefore, favors Wilson.

The final question is whether Wilson suffered prejudice as a result of the delay. In *Doggett*, the Supreme Court addressed the amount of prejudice that a defendant must prove when the government is negligent in its pursuit and prosecution of a defendant. Unlike a bad-faith delay, from which prejudice is presumed, or governmental exercise of reasonable diligence, from which actual prejudice must be