NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0306n.06

No. 17-4063

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UGBE OJILE, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE |
| | ) | SOUTHERN DISTRICT OF |
| SHELBIE SMITH, Warden, | ) | OHIO |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

**FILED**
Jun 14, 2019
DEBORAH S. HUNT, Clerk

Before: MERRITT and LARSEN, Circuit Judges.[1]

LARSEN, Circuit Judge. Ugbe Ojile appeals the district court's denial of his habeas petition under 28 U.S.C. § 2254. Ojile, along with his co-defendant Kenyatta Erkins, was convicted of a litany of state robbery offenses arising from a scheme to rob people returning home from two casinos. The district court issued a certificate of appealability on three issues: (1) whether eyewitness identification testimony violated Ojile's right to due process because the prosecution showed the eyewitness a photo of Ojile before trial; (2) whether the testimony of a jailhouse informant violated Ojile's right to counsel; and (3) whether the evidence supporting Ojile's convictions for complicity to robbery was insufficient because complicity to robbery under Ohio Revised Code (ORC) § 2911.02(A)(1) requires proof of a deadly weapon.

---

[1] The third member of this panel, Judge Damon J. Keith, died on April 28, 2019. This decision is entered by the quorum of the panel. 28 U.S.C. § 46(d).

Concluding that Ojile's claims lack merit, we AFFIRM the district court's denial of his habeas petition.

I.

A. Factual Background

Ojile and his co-defendant Erkins were indicted for a series of robberies or attempted robberies occurring from February 2009 through October 2010. *See State v. Ojile*, Nos. C–110677, C–110678, 2012 WL 6674405, at *1–2 (Ohio Ct. App. Dec. 21, 2012) (direct appeal). Erkins and Ojile used substantially the same method to commit each robbery or attempted robbery. *Id.* at *1–5. Erkins would enter a casino and find victims carrying large amounts of cash. *Id.* Ojile would wait in a car outside the casino, and Erkins would speak to him by phone, discussing possible targets. *Id.* They would generally select victims who were older or who were otherwise "easy targets." *Id.* at *1. Once the soon-to-be victims left the casino, Ojile and Erkins would follow them home and rob them at gunpoint. *Id.* at *1–5. Erkins' girlfriend, Amy Hoover, also participated in at least one of the robberies. *Id.* at *1.

During their lengthy investigation of this scheme, the police thwarted several attempted robberies by pulling over vehicles being tailed by Ojile and Erkins. *Id.* at *4–5. The police finally apprehended Ojile and Erkins by having Kyle Ingram, an undercover police officer, pose as an elderly gambler at one of the casinos. *Id.* at *1. When Ingram saw Erkins walking by him in the casino, the undercover officer pulled out a wad of cash. *Id.* Erkins called Ojile to report that he had a "target." *Id.* When Ingram left the casino and drove away, Ojile and Erkins followed. *Id.* The police pulled their car over and found a backpack containing a Glock handgun (stolen from a previous robbery victim), a live round of ammunition, a BB gun, a previous victim's papers, and duct tape that had been used to tie up another previous victim. *Id.* Police searched Ojile's apartment and found a Glock Magnum handgun and a previous victim's ID cards. *Id.* at *2.

Ojile, Erkins, and Hoover were charged with numerous crimes arising from the robberies. Ojile and Erkins were tried jointly in a bench trial, and Ojile was convicted of six counts of aggravated robbery, one count of robbery, six counts of complicity to robbery, and one count of conspiracy to commit aggravated robbery. *Id.* at *1. Hoover testified against Ojile and Erkins. *Id.* at *13. Ojile was convicted and sentenced to concurrent prison terms of 10 years and 25 years.

B. Challenged Evidence at Trial

At trial, the prosecution presented the eyewitness identification testimony of Michael Weisbrod, a professional poker player who frequented one of the casinos targeted by Ojile and Erkins. In February 2009, Weisbrod had been robbed in his home by unknown assailants. In April 2010, he was robbed again, this time after winning $8,000 at one of the targeted casinos. As he was trying to enter his apartment, two African-American men approached him and robbed him at gunpoint.

At trial, Weisbrod testified via video that Ojile was one of the men who had robbed him in April 2010. Weisbrod had initially described his attackers as being African-American men of medium build, wearing hoodies and jeans or dark pants. Weisbrod testified that the area where he saw the men was well lit, and that he had gotten a good look at them. Roughly six months after the attack, Weisbrod saw television news stories about the arrest of Erkins, Ojile, and Hoover, and he recognized Ojile and Erkins as the two men who committed the second robbery. Cross-examined at trial, Weisbrod disclosed that, two weeks before trial, the prosecutors had shown him single photos of Ojile, Erkins, and Hoover, and said that "these [were] the people up for trial." Ojile's trial counsel did not move to suppress Weisbrod's testimony.

The trial also featured the testimony of Tyrone Tanks, a jailhouse informant. In February 2011, Tanks was transferred from federal prison in Michigan to the Hamilton County jail (where Ojile was being held) in order to testify for the state in an unrelated criminal prosecution. Prior to

the transfer, Tanks had not had any communications with the prosecution in Ojile's case, and he was not familiar with the proceedings against Ojile. He and Ojile recognized each other from a previous visit to one of the casinos. Ojile disclosed the details of some of the robberies to Tanks and also discussed his plan to argue at trial that the police had planted evidence in his apartment. A few weeks later, Tanks wrote a letter to Ojile's prosecutors saying that he had information that might be useful to them. The prosecutors deposed Tanks on April 6, 2011. During the deposition, Tanks told the prosecutors everything Ojile had said.

At some point following the deposition, Ojile was moved into Tanks' cell for four or five days. Ojile has submitted an unsigned letter—purportedly from Tanks and dated May 1, 2011—that suggests Tanks shared additional information with the prosecutors after the April 6 deposition. But Tanks' trial testimony was not materially different and was only slightly more detailed than his testimony at the April 6 deposition—i.e., when deposed, Tanks said that Ojile intended to claim that the police had planted evidence in his apartment, but at trial, Tanks testified that Ojile planned to say that a specific officer had planted the evidence. Ojile's trial counsel did not move to suppress Tanks' testimony.

### C. Ojile's Direct Appeal and State Postconviction Relief

Following trial, Ojile timely appealed, claiming, inter alia, (1) that Weisbrod's identification testimony was unreliable because of the state's unduly suggestive pretrial identification procedures; (2) that his trial counsel was ineffective for failing to object that Tanks' testimony was inadmissible because it had been procured in violation of the Sixth Amendment; and (3) that there was insufficient evidence to support his convictions for complicity to the robberies that went uncompleted. *See Ojile*, 2012 WL 6674405, at *7–9, 11–12.

The Ohio Court of Appeals denied Ojile's eyewitness identification claim. *Id.* at *12. Because Ojile's counsel had not objected at trial, the court reviewed the claim for plain error and

held that "[t]he record shows that both Weisbrod's pretrial identification and his subsequent in-court identification of Ojile were reliable and that there was no likelihood of misidentification." *Id.* "The in-court identification," the court explained, "was the result of Weisbrod's previous identification of Ojile. Consequently, Ojile has failed to show that the court erred in allowing Weisbrod's in-court identification of Ojile, [much] less that it committed plain error." *Id.*

The court also denied Ojile's ineffective assistance of counsel claim, concluding that "Ojile ha[d] failed to meet his burden to show that he was prejudiced by" the failure to exclude Tanks' testimony. *Id.* at *11. Specifically, the court found that "[t]he record does not support Ojile's claim that Tanks provided damaging testimony about any specific statements Ojile had made after Tanks had met with prosecutors." *Id.*

Finally, the court held that the evidence was sufficient to sustain Ojile's convictions for complicity to robbery under ORC § 2911.02(A)(1). *Id.* at *8. The court explained that the elements of the underlying robbery offense were that "[n]o person, in attempting or committing a theft offense . . . or in fleeing immediately after the attempt or offense, shall . . . [h]ave a deadly weapon on or about the offender's person, or under the offender's control." *Id.* at *7 (alterations in original) (quoting ORC § 2911.02(A)(1)). Responding to Ojile's reliance on the fact that some of the robberies were never completed, the court explained that ORC § 2911.02 also prohibits attempted robbery, so it was only necessary for the jury to find that Ojile was complicit in the *attempted* commission of robberies. *Id.* at *7–8. And "the evidence showed they took substantial steps showing their criminal purpose to rob the victims." *Id.* at *8. Ojile petitioned the Ohio Supreme Court for review, but that court declined jurisdiction.[2]

---

[2] Ojile's direct appeal was successful on several claims irrelevant to this habeas petition. *See Ojile*, 2012 WL 6674405, at *6–7. The Ohio Court of Appeals remanded for the trial court to vacate Ojile's conviction for conspiracy to commit robbery because Ojile had erroneously been convicted

On June 1, 2012, while his direct appeal was pending, Ojile moved for post-conviction relief pursuant to ORC § 2953.21. Ojile alleged that he had been denied his right to counsel by the admission of Tanks' testimony. He attached a copy of the transcript from Tanks' April 6 deposition, and the May 1 letter (purportedly from Tanks) suggesting that another meeting had taken place. The trial court held that res judicata prohibited it from conducting a hearing on Ojile's claims because the claims either were raised or could have been raised at trial or on direct appeal. Ojile appealed, and the Ohio Court of Appeals held that Ojile's claim was, in fact, barred by the law of the case because the issue regarding Tanks' testimony had been adjudicated on direct appeal. The Ohio Supreme Court declined jurisdiction.[3]

D. Federal Habeas Proceedings

Ojile filed a pro se habeas petition under 28 U.S.C. § 2254, raising ten grounds for relief. The state argued that these claims were procedurally defaulted or meritless. The magistrate judge issued an initial report and recommendation (R&R), and then a supplemental R&R, concluding that Ojile's petition should be denied. *Ojile v. Oppy*, No. 1:13–cv–844, 2014 WL 6808785 (S.D. Ohio Dec. 2, 2014) (initial R&R); *Ojile v. Oppy*, No. 1:13-cv-844, 2015 WL 4603458 (S.D. Ohio July 30, 2015) (supplemental R&R). The district court largely agreed with the magistrate judge's analysis and denied the petition, but the court granted a certificate of appealability (COA) on three

---

of both conspiracy to commit robbery and robbery for the same underlying conduct. *Ojile*, 2012 WL 6674405, at *6. The Ohio Court of Appeals also held that the trial court's final judgment erroneously found Ojile guilty of a count on which he was acquitted and remanded for the trial to vacate that conviction. *Id.* at *7. And the court noted a number of clerical errors in the judgment that needed to be fixed on remand. *Id.* Because of these changes, Ojile's sentence was reduced to 22 years.

[3] In February 2013, Ojile also applied to reopen his appeal pursuant to Ohio R. App. P. 26(B), alleging ineffective assistance of appellate counsel for failing to appeal numerous issues including that Tanks' testimony violated Ojile's right to counsel. The Court of Appeals summarily denied the 26(B) motion, and the Ohio Supreme Court declined jurisdiction.

issues: (1) whether the eyewitness identification testimony violated Ojile's due process rights because, before trial, the prosecution had shown the eyewitness photos of the defendants; (2) whether the testimony of a jailhouse informant violated Ojile's right to counsel; and (3) whether Ohio robbery under ORC § 2911.02(A)(1) requires proof of a deadly weapon. *Ojile v. Warden, Corr. Reception Ctr.*, No. 1:13CV844, 2017 WL 4334196, at *12 (S.D. Ohio Sept. 30, 2017).

Ojile timely appealed and petitioned this court for an expanded COA concerning three additional issues: (1) whether trial counsel was ineffective for failing to secure expert testimony to prove an alibi; (2) whether the trial court violated due process by convicting and sentencing him for a crime for which he was not charged or tried; and (3) whether Weisbrod's testimony via video violated Ojile's Sixth Amendment right to confrontation. This court denied Ojile's motion to expand his COA. *Ojile v. Smith*, No. 17-4063 (6th Cir. Mar. 2, 2018) (order).

II.

A. Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) sharply limits federal court review of a state habeas petitioner's claims of error. Where a state court has adjudicated a claim on the merits, we may reverse the state court's decision only if it (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Where a state court has not adjudicated a claim on the merits," the claim "is reviewed de novo by a federal court on collateral review." *Trimble v. Bobby*, 804 F.3d 767, 777 (6th Cir. 2015).

B. Eyewitness Identification

"The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). Notwithstanding this general principle, the Supreme Court has held that due process may "require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was . . . procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id.* at 248. And the Court has authorized a two-step inquiry "to determine whether the Due Process Clause requires suppression of an eyewitness identification tainted by police arrangement." *Id.* at 238. At the first step, courts should consider whether "law enforcement officers use[d] an identification procedure that is both suggestive and unnecessary." *Id.* at 238–39. Yet, the Supreme Court has held that "[e]ven when the police use such a procedure, . . . suppression of the resulting identification is not the inevitable consequence." *Id.* at 239. Rather, at the second step, courts should only suppress the tainted identification when "the indicators of a witness' ability to make an accurate identification are outweighed by the corrupting effect of law enforcement suggestion." *Id.* (citations, quotation marks, and brackets omitted).

Ojile posits that the "corrupting effect" of the prosecution's "suggestive and unnecessary" photograph display outweighed the reliability of Weisbrod's in-court identification. The Warden counters that Weisbrod's testimony was sufficiently reliable to defeat Ojile's due process challenge. We agree. And given the weakness of the claim, we need not address the more difficult question whether the claim was, as the Warden also argues, procedurally defaulted. *See Storey v. Vasbinder*, 657 F.3d 372, 380 (6th Cir. 2011). Instead, "we cut to the merits here." *Id.* And since

Ojile's claim would fail even de novo review, we decline to address the question whether AEDPA deference would apply to the state court's rejection of the claim on "plain error" review.[4]

There is little doubt that the prosecution's pretrial photograph display was "unduly suggestive." *See Manson v. Brathwaite*, 432 U.S. 98, 116 (1977) (explaining that "identifications arising from single-photograph displays may be viewed in general with suspicion"). Nor does the Warden justify that conduct. The question thus becomes whether the "indicators of [Weisbrod's] ability to make an accurate identification" were "outweighed by the corrupting effect" of the prosecution's photograph display. *Id.*

The Supreme Court has articulated five factors for assessing the reliability of eyewitness identification: (1) the witness's opportunity to view the suspect at the time of the crime, (2) the degree of the witness's attention, (3) the accuracy of the description, (4) the witness's level of certainty about the identification, and (5) the time between the crime and the confrontation.

---

[4] The district court applied AEDPA deference to the state court's determination, on plain error review, that Weisbrod's testimony was reliable. Whether AEDPA deference applies to the state court's conclusion, on plain error review, that *no error* occurred is actually a bone of contention in this circuit. In *Fleming v. Metrish*, 556 F.3d 520, 532 (6th Cir. 2009), this court held that the decision of a state court on plain error review may be entitled to AEDPA deference if the state court actually reaches the merits of the claim. Here, the state court concluded that there was "no error" in admitting Weisbrod's testimony, so it reached the merits, and, under *Fleming*, we would review Ojile's claim under the more deferential standard. Indeed, another panel of this court applied AEDPA deference to Erkins' parallel challenge to the identification. *See Erkins v. Chuvalas*, 684 F. App'x 493, 498 (6th Cir. 2017).

But *Fleming*'s holding has been disputed by subsequent published cases. *See Frazier v. Jenkins*, 770 F.3d 485, 496, n.5 (6th Cir. 2014) ("We have repeatedly held that plain-error review is not equivalent to adjudication on the merits, which would trigger AEDPA deference."); *but see id.* at 506 (Sutton, J., concurring in part and concurring in the judgment) (explaining that *Fleming* "makes clear as day that a state court's plain-error review of an issue may receive AEDPA deference when the state court addresses the merits of the federal claim"). *Fleming* appears to be the first case squarely resolving this issue, but the weakness of Ojile's due process claim makes it unnecessary for us to address whether AEDPA deference should apply.

*Brathwaite*, 432 U.S. at 114–16. Applying these factors here indicates that Weisbrod's identification—like many eyewitness identifications—was only moderately reliable.

The first factor, Weisbrod's opportunity to view the perpetrators, cuts in favor of reliability. Weisbrod testified that the area where he was robbed was well lit, the robbers were not wearing masks, and he got a good look at their faces. At the time, he told the police he "would probably be able to identify the suspects if he saw them again," though he did not say he would "certainly" be able to do so. The second factor, Weisbrod's degree of attention, weighs against reliability. Weisbrod testified that the robbery was a "very, very traumatic experience." And this court has stated that "[t]here is a great potential for misidentification when a witness identifies a stranger based solely upon a single brief observation, and this risk is increased when the observation was made at a time of stress or excitement." *Wilson v. Mitchell*, 250 F.3d 388, 398 (6th Cir. 2001) (quoting *United States v. Russell*, 532 F.2d 1063, 1066 (6th Cir. 1976)). The third factor, the accuracy of Weisbrod's initial description of the suspects, also cuts somewhat against reliability. His description was generic—two black males, in their 20s, with black hoodies—and cross-racial identifications are often suspect. *Cf. Webb v. Havener*, 549 F.2d 1081, 1086 (6th Cir. 1977). The fourth factor, the certainty of Weisbrod's in-court identification, favors reliability. At trial, Weisbrod expressed absolute certainty that Ojile was one of the men who robbed him. Lastly, the fifth factor, the gap between the crime and the identification, cuts against reliability; there was roughly a year between the crime and the in-court identification. *See Neil v. Biggers*, 409 U.S. 188, 201 (1972) (suggesting that a delay of seven months might undermine reliability). The result of this analysis is thus that Weisbrod's eyewitness identification was only somewhat reliable.

Nevertheless, the reliability of Weisbrod's identification was not "outweighed by the corrupting effect of the challenged identification itself." *Brathwaite*, 432 U.S. at 116. The

prosecution did not seek to introduce Weisbrod's suggestively-procured pretrial identification as evidence at trial. Ojile, therefore, must show that the prosecution's *pretrial* photograph display so corrupted Weisbrod's *in-court* identification as to create a substantial risk that he identified Ojile in error. It is not plausible, however, that the pretrial display had any influence (or, at least, any material influence) on Weisbrod's in-court identification. This is because Ojile has not disputed Weisbrod's testimony at trial that he recognized Ojile and his co-defendants in news reports broadcast shortly after they were arrested. Thus, well before the police showed Weisbrod the photo of Ojile, Weisbrod had already seen a picture of Ojile, and had decided that he was one of the men who robbed him. Given this prior valid identification, Ojile has not shown that the prosecution's pretrial photograph display had any further deleterious effect whatsoever.

Of course, the news reports were as suggestive as the prosecution's photograph display, if not more so. But in *Perry* the Supreme Court affirmed that due process is only implicated "when *the police* have arranged suggestive circumstances leading the witness to identify a particular person as the perpetrator of a crime." 565 U.S. at 232 (emphasis added). The news reports do not implicate due process because they were not state action. In sum, the de minimis "corrupting effect" of the government's pretrial display did not outweigh Weisbrod's ability to make an accurate identification of Ojile in court, and we affirm the district court's denial of this claim.

### C. Right to Counsel

Ojile next argues that he was deprived of his right to counsel when the government used Tanks as its agent to elicit incriminating information. In *Massiah v. United States*, the Supreme Court held that it violates a criminal defendant's right to counsel when, at trial, the state uses "evidence of [the defendant's] own incriminating words, which [state] agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." 377 U.S. 201, 206 (1964). "[T]he primary concern of the *Massiah* line of decisions is secret interrogation by

investigatory techniques that are the equivalent of direct police interrogation." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986). Thus, the Supreme Court has found inadmissible "incriminating statements made by [a criminal defendant] to his cellmate, an undisclosed Government informant, after indictment and while in custody." *United States v. Henry*, 447 U.S. 264, 265 (1980). Put broadly, the state cannot "intentionally creat[e] a situation likely to induce [a criminal defendant] to make incriminating statements without the assistance of counsel." *Id.* at 274.

Here, the district court held that Ojile's *Massiah* claim was procedurally defaulted. The Warden defends that conclusion on appeal, but argues, alternatively, that the claim is meritless. Because it is indeed meritless, we again sidestep the murky procedural default issue and reject Ojile's *Massiah* challenge on the merits. *See Storey*, 657 F.3d at 380.

Ojile argues that Tanks acted as a state agent after he was deposed by the prosecution on April 6, 2011; the Warden disputes that point. But it does not matter. Even if Ojile were correct, he has not identified any materially incriminating statements made *after* the April 6 deposition and introduced against him at trial. The only difference between Tanks' April 6 deposition, which comprised Ojile's admissions before Tanks was putatively acting as a state agent, and Tanks' testimony at trial is that the trial testimony was slightly more specific. Tanks told prosecutors during his deposition that Ojile planned to say that the police planted a victim's ID cards in his apartment. At trial, Tanks testified that Ojile said he planned to say that a specific officer—Officer Morgan—had planted the victim's ID cards.

Even assuming that this detail was extracted from Ojile after the April 6 deposition— assuming, therefore, that Ojile's right to counsel was infringed—the error was certainly harmless. *Ayers v. Hudson*, 623 F.3d 301, 317 n.12 (6th Cir. 2010) ("*Massiah* violations are normally subject to harmless-error analysis." (citing *Milton v. Wainwright*, 407 U.S. 371 (1972))). Based solely on

Ojile's pre-April 6 admissions, Tanks could permissibly testify about Ojile's numerous admissions of guilt and his strategy to accuse the police of planting evidence. In light of this, and given the evidence of Ojile's guilt, Tanks' ability to name a specific officer—Officer Morgan—as the one Ojile had planned to name as the planter of the evidence did not have a "substantial and injurious effect or influence in determining the . . . verdict." *Moore v. Berghuis*, 700 F.3d 882, 890 (6th Cir. 2012) (quoting *Tolliver v. Sheets*, 594 F.3d 900, 924 (6th Cir. 2010)); *id.* at 889 (finding error not harmless where "there was no evidence, other than the custodial confession, indicating premeditation or deliberation by" the defendant convicted of premeditated murder). Because any constitutional violation was harmless, the district court did not err in denying habeas relief on this ground.

### D. Proof of a Deadly Weapon

The last issue certified by the district court for our review is whether attempted robbery under ORC § 2911.02(A)(1) requires proof of a deadly weapon. This question arose because Ojile argued—on direct appeal and in the federal district court below—that the evidence was insufficient to establish his convictions for complicity to robbery under ORC § 2911.02(A)(1). The Ohio Court of Appeals rejected Ojile's sufficiency challenge, *see Ojile*, 2012 WL 6674405, at *7–8, and the federal district court did, too, *see Ojile*, 2017 WL 4334196, at *2–3.

But the district court, unlike the state court, appeared to reject Ojile's claim on the assumption that attempted robbery under § 2911.02(A)(1) does *not* require proof of a deadly weapon. *See id.* at *3 ("The Court finds this issue to be a particularly close call, as it is not particularly convinced that the subsection of the statu[t]e under which Petitioner was convicted does not require proof of a weapon."). That assumption is wrong. Section 2911.02(A)(1) explicitly provides that "[n]o person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall . . . [h]ave a deadly weapon on or about the offender's person, or

under the offender's control." And the Ohio Supreme Court has explained that it is the "possession of a deadly weapon . . . that is required to elevate a theft offense to robbery." *State v. Wharf*, 715 N.E.2d 172, 174 (Ohio 1999).

As the government points out, § 2911.02(A)(1) itself proscribes *attempted* robbery, so the state needed to show only a "substantial step" toward the commission of the crime. *See State v. Group*, 781 N.E.2d 980, 995 (Ohio 2002) ("A 'criminal attempt' is when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime." (quotations omitted)). So an attempted theft offense—not just a completed theft offense—can form the basis for a conviction under § 2911.02(A)(1). Nevertheless, for the attempted *theft* to become an attempted *robbery* under § 2911.02(A)(1), there must also be evidence of "a deadly weapon on or about the offender or under the offender's control." *State v. Holmes*, 909 N.E.2d 163, 168 (Ohio Ct. App. 2009).

On appeal, the Warden only halfheartedly defends the district court's construction of the statute, claiming that we are bound by the Ohio Court of Appeals' interpretation of the statute in this case. But the Ohio Court of Appeals never suggested that evidence of a deadly weapon was unnecessary; it merely affirmed that the evidence was sufficient to sustain Ojile's convictions. *See Ojile*, 2012 WL 6674405, at *7–8. And the trial court record makes clear that the prosecution thought it was required to prove the presence of a deadly weapon, explaining the elements of the crime to the judge as follows: "We believe there is sufficient evidence to meet the charge of robbery . . . . In attempting to commit a theft offense, the defendants were armed with a deadly weapon." In sum, we must answer the district court's certified question—whether the statute requires proof of a deadly weapon—in the affirmative.

But although we conclude that the district court incorrectly interpreted the statute, we still affirm the district court's denial of the sufficiency claim. *See U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 330 F.3d 747, 750 (6th Cir. 2003) ("We may affirm a decision of the district court if correct for any reason, including one not considered below."). Though its reasoning was mistaken, the district court was right to deny Ojile relief.

Under *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), evidence is constitutionally insufficient only if, "viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard, alone, presents "a nearly insurmountable hurdle," and AEDPA requires an additional level of deference to a state court's adjudication of a sufficiency challenge. *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011). The Ohio Court of Appeals adjudicated Ojile's sufficiency of the evidence claim on the merits. So we cannot grant relief unless the Ohio court's denial of Ojile's sufficiency claim was not merely wrong but objectively unreasonable—i.e., "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The Ohio Court of Appeals' denial of Ojile's sufficiency arguments was not objectively unreasonable.[5] Ojile asserts that there was no evidence that he or Erkins had a deadly weapon when

---

[5] Ojile challenges the state court's sufficiency of the evidence determination as to five convictions for complicity to robbery (counts 22, 23, 25, 28, and 29). The parties dispute whether Ojile forfeited his argument that the evidence was insufficient to show a *substantial step* toward the commission of the crimes underlying these five counts. For all five of these counts, the state presented evidence that the robbers followed the potential victims by car after they left the casino. With respect to three of the counts, the police intervened to prevent the robberies by pulling over the potential victims' vehicles, but it is less clear why Ojile and Erkins did not go through with the other robberies. Regardless, we need not decide the substantial step issue because the district court granted a COA only on the deadly weapon question. Insofar as Ojile invites us to expand the

they followed five potential targets leaving casinos. Ojile is right that there was no direct evidence. But there was circumstantial evidence supporting this element of the offense. There was evidence that the robberies followed a pattern: Ojile and Erkins selected victims who had just won cash at a casino; the victims were invariably older gamblers or otherwise "easy targets"; when the victims drove home from the casino, Ojile and Erkins followed; and when the victims arrived at their homes, Ojile or Erkins (or both) would approach and demand money *at gunpoint*. Given this high degree of similarity across multiple robberies, a reasonable jury could infer the presence of a gun in the facially identical attempted robberies from the fact that the pair used a gun in all their completed robberies—and in the attempted robbery of Ingram. Viewing the circumstantial evidence in the light most favorable to the prosecution, a rational trier of fact could certainly have found, beyond a reasonable doubt, that a deadly weapon was present. *Jackson*, 443 U.S. at 319. And the state court's decision to this effect was certainly not objectively unreasonable under AEDPA review. We affirm the district court's denial of Ojile's sufficiency claim.

## E. Expanded COA

Finally, Ojile asks this court to exercise its discretion to consider two issues on which a COA has not been granted: (1) whether he was convicted of a crime for which he was not charged in violation of due process; and (2) whether the admission of video-taped depositions and live video testimony at trial violated his confrontation rights under the Sixth Amendment.

This court generally declines to address issues not certified for appeal by the district court or this court. *See Valentine v. Francis*, 270 F.3d 1032, 1035 (6th Cir. 2001) ("We cannot consider this argument since a certificate of appealability did not issue . . . ."). Ojile previously sought to

---

issued COA and address whether the state court's substantial-step determination was objectively unreasonable, we decline to exercise our discretion to do so. *See Willis v. Jones*, 329 F. App'x 7, 13 (6th Cir. 2009).

expand his original COA in this court, and this court declined his request. *Cf. Willis*, 329 F. App'x at 13 ("[A]s this court has already decided not to grant a COA on the original denial of habeas relief, we decline to expand . . . the certificate of appealability to encompass the original denial of habeas."). We again decline to expand the COA.

* * *

For the foregoing reasons, we AFFIRM the district court's denial of Ojile's habeas petition.